**UNITED STATES, Appellee,**

v.

**Sidney WEINER, Defendant, Appellant.**

**No. 92–1708.**

United States Court of Appeals,
First Circuit.

Heard May 3, 1993.
Decided Aug. 23, 1993.

Harry C. Mezer, Boston, MA, for appellant.

Sean Connelly, Atty., U.S. Dept. of Justice, Washington, DC, with whom A. John Pappalardo, U.S. Atty., Ernest S. DiNisco, Asst. U.S. Atty., and Todd E. Newhouse, Asst. U.S. Atty., Boston, MA, were on brief, for appellee.

Before TORRUELLA, Circuit Judge, FEINBERG,* Senior Circuit Judge, and BOUDIN, Circuit Judge.

BOUDIN, Circuit Judge.

Sidney Weiner, together with other defendants, was charged in a multi-count indictment revolving around loansharking and illegal debt collection. In the nineteen counts directed at Weiner, he was accused of mail fraud, 18 U.S.C. § 1341, conspiracy to collect extensions of credit by extortionate means, 18 U.S.C. § 894, and conducting and conspiring to conduct the affairs of an enterprise through a pattern of racketeering activity or collection of unlawful debt, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), (d).

Weiner's case was severed for reasons relating to his health, and he stood trial alone.[1] At the close of the government's case, the trial court granted Weiner's motion for acquittal as to all of the mail fraud counts and all but four counts charging conspiracy to collect an extension of credit through extortion. The jury convicted Weiner of conspiring to violate, and violating, RICO, and of three counts of extortion conspiracy under 18 U.S.C. § 894; it acquitted Weiner on the remaining count under 18 U.S.C. § 894. The district court then sentenced Weiner to a term of two years' imprisonment. Weiner now appeals. We affirm.

## I.

The gist of the government's case, so far as pertinent here, was that Weiner, a bank official, associated himself with a loanshark enterprise headed by one Frank Oreto, Sr.; that the loanshark enterprise encouraged debtors to obtain bank loans, sometimes unlawfully, to pay off prior loanshark debts; that new bank debts were collected by loanshark enforcers using extortion; and that Weiner used his banking position and properties he owned to facilitate the enterprise's affairs. Because Weiner challenges the sufficiency of the evidence, we summarize the government's proof in some detail. Construed in a light favorable to the verdict, *see*

*United States v. Rivera–Santiago,* 872 F.2d 1073, 1078–79 (1st Cir.), *cert. denied,* 492 U.S. 910, 109 S.Ct. 3227, 106 L.Ed.2d 576 (1989), the government's evidence permitted the jury to find the following.

In 1982, Weiner, a director, consultant and stockholder of Capitol Bank and Trust Company of Boston ("Capitol"), hired Oreto to collect certain loans in default that were made by Capitol. Oreto headed a loanshark operation that loaned cash to borrowers at interest rates as high as seven percent per week, and that employed tall, physically imposing men who used threats of violence to collect from debtors who fell behind in their payments. Through Weiner, Capitol compensated Oreto, with off-the-record cash payments from the bank, for his services in collecting Capitol's own loans.

The three extortion conspiracy counts for which Weiner was convicted involved debts owed by Frank Falzone, Fred Lambert, and Chun Hing "Joe" Wong. Falzone and Lambert each obtained a $2500 loan from Capitol by paying kickbacks to Fred Dandrow and Ron Browder. Dandrow introduced Falzone and Lambert to Browder, a Capitol loan officer. Browder instantly approved their loan applications and issued bank checks in the amount of the loans. Lambert borrowed the money on his bookmaker's instructions to consolidate his bookmaking debts.

When Falzone and Lambert defaulted on their loans, Dandrow was summoned to Oreto's house to meet with Oreto and Weiner. At the meeting, Oreto said that Dandrow would be held responsible for any outstanding debt on the loans secured by kickbacks, and Dandrow agreed to contact the borrowers. At a second meeting with Oreto which Weiner did not attend, Dandrow was introduced to "Beardsy" Santiano and told to bring Santiano to the borrowers' homes. Santiano is 6'4" tall, weighs between 230–280 pounds, and was described by Dandrow as resembling "a motorcycle gang member." Dandrow later met with Weiner and Dennis Petrosino, another of Oreto's collectors.

---

* Of the Second Circuit, sitting by designation.

1. Other defendants were tried and convicted in *United States v. Oreto,* appeals pending, No. 91–1769, et al., 1st Cir.

Weiner told Dandrow to work with Petrosino in collecting the loans.

Dandrow went to Falzone's home, accompanied by Santiano and Petrosino, and asked Falzone to get inside a car to discuss repayment of his loan. Inside the car, Petrosino told Falzone that his loan "wasn't going to go away" and that Falzone's parents would have to pay the loan if Falzone did not come up with the money. Falzone testified that he was "pretty scared" and "just wanted to get out of the car." On another occasion, Santiano drove Falzone to a house for a meeting with Oreto, and Oreto told Falzone to make weekly payments at Gateway Rent–A–Car, a business owned by Weiner. Falzone left the meeting "scared" and made two subsequent payments at Gateway. Eventually Falzone's mother contacted Capitol to arrange a repayment schedule with the bank.

Lambert first came into contact with the Oreto organization after receiving a phone call instructing him to go to Gateway Rent–A–Car. There, he met "two big guys" who said they "wanted their money." Lambert began to make weekly payments of $25 which he paid to Oreto's men who would come to his home in Winthrop to collect. Lambert stopped making payments after he moved to another town. When he later moved back to Winthrop, he was visited late one night by two different "big," "heavy" men. In a discussion held in the men's car, Lambert agreed to resume payment and handed over $25 on the spot.

When the payments later ceased, Lambert was summoned to a meeting with Oreto at the Fasad's nightclub, another business owned by Weiner. Lambert thereafter made weekly payments on a consistent basis. He testified that Oreto and his men scared him. The Lambert loan was discussed by Weiner and Oreto's "collection manager," John Costa, in an intercepted telephone conversation. When Costa said that Lambert had been located and Costa proposed to "get back in action with him," Weiner approved this plan.

Wong obtained his loan from the Community Cooperative Bank ("Community"), where Weiner was also a director. Community was later acquired by Capitol. Wong had heavy gambling debts which he paid off by borrowing money from Oreto at weekly interest rates of five percent. Wong's repayments to Oreto were made at Gateway Rent–A–Car. Wong then obtained a $30,000 loan from Community in order to pay off his debt to Oreto. With Oreto's knowledge, Wong put up his parent's house as collateral for the loan and signed his parents' names to the loan papers supplied by Oreto. The loan from Community was approved by Weiner.

Oreto required Wong to make weekly payments of $500 on the loan. When Wong fell behind on his payments, Oreto sent Petrosino and another man to the restaurant where Wong worked. The men grabbed Wong, who was hiding in the kitchen, took him outside, and told him that Oreto was mad and wanted to see him. In a meeting at Fasad's the next day, Oreto told Wong, "it's not nice, you don't pay ... I can beat you up with a baseball bat." Wong fled to New Hampshire and had his wife make further payments on the loan. Wong's parents eventually learned that a mortgage had been placed on their house without their consent. After they contacted Community to report the problem, Weiner agreed to purchase the loan from the bank.

The Oreto loanshark operation itself was the subject of extensive evidence, certain of its records having been seized by the authorities. The seized records revealed that "Sid, the bank" paid part of the weekly salary of Costa, Oreto's collection manager, for about 38 weeks in 1984–85. In addition to hiring Oreto to collect bank loans, Weiner allowed Oreto to conduct his loansharking business at Gateway Rent–A–Car and Fasad's nightclub, both properties held in Weiner's name.[2] Oreto was Weiner's silent partner in the ownership and operation of Fasad's.

## II.

The evidence just recited is the core of the government's effort to show that

2. Wong testified that Oreto at one point told him, "We are not working in Gateway anymore. We have a new place called Fernwood restaurant. Next time you come up to pay me, you should go to Fernwood." Fernwood was later renamed "Fasad's".

Weiner had conspired, in violation of 18 U.S.C. 894, to use "extortionate means" in seeking to collect an extension of credit, or more precisely, three loan debts owed respectively by Falzone, Lambert and Wong. Weiner argues that the evidence was insufficient, focusing on the element of extortion. "Extortionate means" includes "the use," or "an express or implicit threat of use," of "violence or other criminal means" to harm any person or property. 18 U.S.C. § 891(7). Weiner argues that the evidence did not permit a rational jury to conclude beyond a reasonable doubt that extortionate means were proved or that he conspired to have the loans collected through such means. We disagree.

Falzone and Lambert were not expressly threatened with violence but implicit threats suffice under the express terms of the statute. The evidence showed, among other things, that Falzone and Lambert were confronted by large, physically imposing men; that these men showed up at their homes, on one occasion late at night; and that Falzone and Lambert were directed to get into a car to discuss payment of the loans. Both Falzone and Lambert testified that they were frightened, with Falzone at one point hiding in his house. The jury could rationally conclude that the two men had good reason to be afraid. As for Wong, Oreto's statement about a beating with a baseball bat is about as plain and direct a threat as one can imagine.

A rational jury could also conclude beyond a reasonable doubt that Weiner knowingly conspired to collect the debts through extortion. An agreement may "be implicit in the working relationship between the parties that has never been articulated but nevertheless amount to a joint criminal enterprise." *United States v. Moran*, 984 F.2d 1299, 1300 (1st Cir.1993). In proving a conspiracy, the government may rely entirely on circumstantial evidence. *United States v. Ortiz*, 966 F.2d 707, 711 (1st Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 1005, 122 L.Ed.2d 154 (1993). Once again, we think that the evidence of Weiner's knowing complicity may not be overwhelming but that it was assuredly adequate.

In this case, there is no reasonable doubt that Weiner employed Oreto to collect bank debts so the only open issue is whether Weiner knew of the means to be employed. Here Weiner's connections with Oreto were extensive, and Oreto operated from properties owned by Weiner or held in his name. "Sid," "Sid, the bank" and "Sid Weiner" were mentioned in the records of the loanshark business, and Weiner consulted directly with Costa, the collection manager, about the Lambert loan. Weiner paid Oreto with off-the-record bank funds, and when the Wong parents threatened to disclose the forgery, Weiner took over the loan from the bank.

This evidence was sufficient to permit a rational jury to conclude beyond a reasonable doubt that Weiner was conscious of the means to be used by the Oreto organization and hired Oreto for just that reason. Weiner testified and offered the jury a different interpretation of the evidence. He said that Oreto was hired merely to locate loan defaulters, that the payments to Oreto were ordered by the bank president, and that he (Weiner) was dismayed when he later learned of Oreto's loansharking activities. The jury was entitled not to credit the thrust of this testimony.

■ Weiner's next objection concerns the testimony of FBI Special Agent Raymond Stirling, whom the government called as an expert witness. Stirling, a specialist on loansharking, reviewed the accounting ledgers and other documents seized from the Oreto organization. His testimony explained transactions reflected in the documents, loanshark terminology, and other matters of a similar nature. Expert testimony is allowed pursuant to Fed.R.Evid. 702 if it will help the jury to understand the evidence or to decide a particular fact in issue in the case. We have upheld the use of an expert witness to explain matters pertaining to loansharking. *United States v. Lamattina*, 889 F.2d 1191, 1193–94 (1st Cir.1989).

Weiner objects to one aspect of the testimony in particular. Over objection, Stirling testified that, based on documents showing the same telephone number next to references in the records to "Sid," "Sid, the bank," and "Sid Weiner," it was his opinion that

these persons were one and the same. Weiner argues that this opinion reflected no special expertise but was a routine inference that the jury could draw on its own. We agree, but regard the error as harmless. The inference was compelling that the references (all to "Sid"), together with identical phone numbers, referred to the same person. Stirling's opinion "connecting the dots" added little or nothing.

■ Weiner next contends that the district court erred in its treatment of evidence relating to the counts that it dismissed prior to the verdict. As earlier noted, the district court directed judgments of acquittal on the mail fraud counts and on other counts charging conspiracy to collect other loans through extortion. The dismissed counts, involving other loanshark debtors, were also incorporated in the RICO counts as predicate acts of racketeering. The district court entered verdicts of acquittal on these counts because in its view the government had failed to adequately link Weiner to the charged activity.

Weiner moved for a mistrial, alleging prejudicial spillover of the evidence introduced to support the dismissed counts. The district court denied the motion but agreed to instruct the jury in the closing charge to disregard this evidence. Although finding the evidence relevant to the remaining RICO charges, the court ordered the evidence stricken and the indictment re-written to exclude reference to the corresponding RICO predicate acts because it thought the jury might otherwise be confused about which counts remained in the case. In the charge, the court neglected to instruct the jury to disregard the stricken evidence, and Weiner's lawyer failed to object to this omission.

Weiner now argues that the district court erred in denying his motion for mistrial or, alternatively, that the judge should have told the jury not to consider the evidence relating to the dismissed counts. The problem is that Weiner was not entitled to have this evidence excluded from the jury's consideration. As the district court correctly perceived, evidence of other loan collections by Oreto's organization was relevant to the remaining RICO charges against Weiner, regardless of whether Weiner was personally involved in the racketeering acts underlying the dismissed counts. As the Second Circuit has explained in the analogous context of severance:

> "[T]he government must prove an enterprise and a pattern of racketeering activity as elements of a RICO violation. Proof of these elements may well entail evidence of numerous criminal acts by a variety of persons, and each defendant in a RICO case may reasonably claim no direct participation in some of those acts. Nevertheless, evidence of those acts is relevant to the RICO charges against each defendant ... because it tend[s] to prove the existence and nature of the RICO enterprise...."

*United States v. DiNome,* 954 F.2d 839, 843 (2d Cir.), *cert denied,* —— U.S. ——, 113 S.Ct. 95, 121 L.Ed.2d 56 (1992). Thus, despite the dismissal of the separate counts, the jury was entitled to consider this evidence in support of the RICO counts. *Accord United States v. Mitchell,* 777 F.2d 248, 260 n. 3 (5th Cir.1985), *cert. denied,* 476 U.S. 1184, 106 S.Ct. 2921, 91 L.Ed.2d 549 (1986); *United States v. Morelli,* 643 F.2d 402, 412 (6th Cir.), *cert. denied,* 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981).

■ Of course, the evidence, although relevant, might have been overly prejudicial. *See* Fed.R.Evid. 403. Of the few examples cited in Weiner's brief, only one is worth mentioning: In an intercepted conversation played for the jury, one of Oreto's operatives says he should "cut out" a debtor's eyes. The statement is graphic, to be sure, but extortion through threats of violence is not a pretty crime. "By design, all evidence is meant to be prejudicial; it is only unfair prejudice which must be avoided." *United States v. Rodriguez–Estrada,* 877 F.2d 153, 156 (1st Cir.1989). Here, the evidence was pertinent in depicting the nature of Oreto's organization; and, as a mere threat, with no actual known victim, it assuredly did not overwhelm the jury.

■ Finally, Weiner objects to the district court's failure to give several instructions requested by Weiner and to the instruction it actually gave on the elements of a

RICO offense. One request was for a "good faith reliance" instruction based on Weiner's claim that he hired Oreto at the direction of the bank president, a retired state probate judge. The instructions on specific intent given by the district court were sufficient; no separate "good faith" instruction was required. *See United States v. Dockray,* 943 F.2d 152, 154–55 (1st Cir.1991). Two other instructions sought, and refused, aimed to refine the extortion concept; but one was potentially misleading and the other a comment upon the evidence.[3]

■ Weiner's challenge to the RICO instruction is two-fold and requires more discussion. Section 1962(c) of the RICO statute makes it a crime to conduct or participate in the conduct of the affairs of an enterprise affecting interstate or foreign commerce "through a pattern of racketeering activity *or* collection of unlawful debt." 18 U.S.C. § 1962(c) (emphasis added). The three predicate counts for which Weiner was convicted each charged extortion, which is a racketeering act under the statute. *See* 18 U.S.C. § 1961(1). Of these three counts, one count (the usurious loan to Wong) involved an unlawful debt as well.

The district court in this case instructed the jury that RICO liability could be predicated upon a pattern of racketeering activity or, alternatively, "upon the collection of a single unlawful debt, *i.e.,* the single loanshark debt owed by Wong." Weiner takes issue with the latter, quoted portion of the instruction because, he says, section 1962(c) requires a "pattern" of collection of unlawful debts, and this precludes RICO liability on the basis of a single instance of collection of an unlawful debt. The objection was duly presented at trial. Although one might at first think that the three extortion convictions automatically showed a pattern and

mooted the issue of statutory construction, the government (correctly) makes no such argument.[4]

We turn, then, to the construction of the statute. If one focused only on section 1962(c)'s language and structure, one might well read the phrase "pattern of racketeering activity or collection of unlawful debt" and think that the word "pattern" modifies "collection of unlawful debt" as well as "racketeering activity." The imprecise wording of section 1962(c), together with the rule of lenity in construing criminal statutes, might favor the interpretation urged by Weiner if our inquiry stopped with section 1962(c). But the matter becomes more complicated, and the opposite result is suggested, when other parts of the statute are consulted.

Section 1962(c), although the most commonly invoked provision of RICO, is only one of four categories of proscribed conduct. Subsection (a) in pertinent part prohibits the use or investment in an enterprise of income derived "from a pattern of racketeering activity *or through* collection of *an* unlawful debt." 18 U.S.C. § 1962(a) (emphasis added). Subsection (b) similarly makes it a crime to acquire or maintain an interest in an enterprise "through a pattern of racketeering activity *or through* collection of *an* unlawful debt." *Id.* § 1962(b) (emphasis added). It is thus clear that the collection of a single unlawful debt is enough under subsections (a) and (b). Weiner has suggested no reason why Congress might have intended that a single act of collection suffice as a source of criminal investment or to gain an interest in an enterprise but that criminally conducting the enterprise's affairs required multiple acts of collection.

In addition, the term "pattern of racketeering activity" is defined in section 1961's definitional provisions as requiring at least

3. The requested charge that "demands for money alone are simply not threats" could easily be misunderstood to mean that something more need be demanded; and the further request that "any anxiety experienced by the four debtors … could be ordinary anxiety [of a debtor called upon to pay]" is a comment on the evidence. The fact that these statements were made by appellate courts in commenting on evidence in particular cases does not convert them into required instructions.

4. The "pattern" offense involves requirements of connection between the offenses, which need not be described here, but no such requirements exist if one unlawful debt collection is enough. Under the "single debt" instruction given by the court, it is possible (at least in theory) that the jury could have made no finding of "pattern" at all and relied solely on the Wong debt.

two acts of racketeering activity occurring within a specified period of time. 18 U.S.C. § 1961(5). But there is no counterpart definition of a "pattern of collection of unlawful debt," as one would expect if such a pattern were an element of one of RICO's core provisions. Instead, section 1961 simply lists "unlawful debt" which is defined as "a debt" incurred under certain conditions, including usury. *Id.* § 1961(6). This further confirms that section 1962(c) was unartfully drafted but must be construed *in pari materia* with sections 1962(a) and (b).

The three circuit courts to have considered this issue have held that a single collection of an unlawful debt satisfies section 1962(c)'s "collection of unlawful debt" requirement. *United States v. Giovanelli*, 945 F.2d 479, 490 (2d Cir.1991); *United States v. Vastola*, 899 F.2d 211, 228 n. 21 (3d Cir.), *vacated and remanded on other grounds*, 497 U.S. 1001, 110 S.Ct. 3233, 111 L.Ed.2d 744 (1990); *United States v. Pepe*, 747 F.2d 632, 645 (11th Cir.1984). Viewing the RICO statute as a whole, we agree. *See also H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 232, 109 S.Ct. 2893, 2897, 106 L.Ed.2d 195 (1989) (stating that "[e]ach prohibited activity is defined in 18 U.S.C. § 1962 to include, as one necessary element, proof either of 'a pattern of racketeering activity' or of 'collection of an unlawful debt.'").

■ Lastly, Weiner contends that the district court's instruction on the type of participation required under section 1962(c) is at odds with the Supreme Court's decision in *Reves v. Ernst & Young*, —— U.S. ——, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), a recent case decided after Weiner's trial. In *Reves*, the Court held that the phrase "to conduct or participate . . . in the conduct" of the affairs of a RICO enterprise, as used in section 1962(c), means that the defendant must have participated in the "operation or management" of the enterprise. —— U.S. at ——, 113 S.Ct. at 1170.

In this case the jury was instructed that "the terms 'conduct' and 'participate' in the conduct of the affairs of the enterprise include the intentional and deliberate performance of acts, functions or duties which are related to the operation or management of the enterprise." Weiner's objection, as we understand it, is that the word "include" in the instruction could suggest that lesser conduct fostering the enterprise in any form is enough to convict. As this objection was not made in the district court, we review for plain error, *see United States v. Georgacarakos*, 988 F.2d 1289, 1294 (1st Cir.1993), and we find none.[5]

Aside from the word "include," there is nothing in the instruction nor in any other part of the court's charge which suggests that something less than involvement in the operation or management of the enterprise will do. And to the extent that the jury was given specific guidance, that guidance precisely mirrored the "operation or management" test subsequently approved in *Reves.* Plainly there was no "miscarriage of justice." *Georgacarakos*, 988 F.2d at 1297. We think that the district court should be commended for its prescience.

## III.

Because litigants stress only the material pertinent to their claims on appeal, appellate courts normally receive a series of snapshots of a case rather than the full canvass of the trial. It may be true in Weiner's case that the evidence showed only that he was loosely confederated with Oreto, and true also that a low level of threat was employed in the three debt collections connected to Weiner. But by their very nature criminal conspiracies are masked, and veiled threats are the hallmark of intelligent extortion. The outcome here was within the bounds of reason.

*Affirmed.*

---

**5.** Arguably, no waiver should be inferred, and no plain error requirement imposed, where the Supreme Court's ruling comes out of the blue and could not have been anticipated. *See Castrignano v. E.R. Squibb & Sons, Inc.*, 900 F.2d 455, 461 (1st Cir.1990). Here, however, *Reves* resolved a split between circuits (apparently the First Circuit had not ruled on the issue) so the objection could easily have been made at trial.