USCA1 Opinion

 

 November 8, 1994 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 91-1769 UNITED STATES OF AMERICA, Appellee, v. FRANK ORETO, SR., Defendant, Appellant. ____________________ No. 91-1770 UNITED STATES OF AMERICA, Appellee, v. FRANK ORETO, JR., Defendant, Appellant. ____________________ No. 91-1771 UNITED STATES OF AMERICA, Appellee, v. DENNIS PETROSINO, Defendant, Appellant. ____________________ CORRECTED ERRATA SHEET CORRECTED ERRATA SHEET The opinion of this Court issued on October 4, 1994, is amended as follows: Page 2 of the Cover Sheet, line 5: Change the name "Dinisco" to "DiNisco". Page 3, lines 9-10: Delete the words "Hobbs Act". Page 3, line 11: After the number "894" add the words "(the extortionate credit transactions or "ECT" statute)". Page 8, line 12: Add the word "an" before the word "additional". Page 11, line 22: Substitute "2" for "12". Page 17, lines 17-18: Replace the words "Hobbs Act" with the words "ECT statute". Page 23, line 7: Substitute " 892," for " 1892,". Page 23, line 25: Replace the words "Hobbs Act" with the words "ECT statute". Page 24, line 8: Add the word "by" after the word "employed". Page 29, line 16: Delete the quotation marks after the word "plus". Page 30, line 17: Delete the word "moreover,". Page 30, line 18: Change the words "`Bible' and Daniel" to "`Bible'; and Daniel". On the following pages and lines, substitute "ECT" for "Hobbs Act": Page 4, lines 7 and 10; page 6, line 16; page 15, lines 15, 18 and 22; page 17, lines 1, 5 and 11; page 18, line 21; page 22, line 8; page 27, line 23; page 28, lines 2, 4, 8-9 and 12.  October 26, 1994 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 91-1769 UNITED STATES OF AMERICA, Appellee, v. FRANK ORETO, SR., Defendant, Appellant. ____________________ No. 91-1770 UNITED STATES OF AMERICA, Appellee, v. FRANK ORETO, JR., Defendant, Appellant. ___________________ No. 91-1771 UNITED STATES OF AMERICA, Appellee, v. DENNIS PETROSINO, Defendant, Appellant. ____________________ ERRATA SHEET ERRATA SHEET The opinion of this Court issued on October 4, 1994, is amended as follows: Page 2 of the Cover Sheet, line 5: Change the name "Dinisco" to "DiNisco". Page 3, lines 9-10: Delete the words "Hobbs Act". Page 3, line 11: After the number "894" add the words "(the extortionate credit transactions or "ETC" statute)". Page 8, line 12: Add the word "an" before the word "additional". Page 11, line 22: Substitute "2" for "12". Page 17, lines 17-18: Replace the words "Hobbs Act" with the words "ETC statute". Page 23, line 7: Substitute " 892," for " 1892,". Page 23, line 25: Replace the words "Hobbs Act" with the words "ETC statute". Page 24, line 8: Add the word "by" after the word "employed". Page 29, line 16: Delete the quotation marks after the word "plus". Page 30, line 17: Delete the word "moreover,". Page 30, line 18: Change the words "`Bible' and Daniel" to "`Bible'; and Daniel". On the following pages and lines, substitute "ETC" for "Hobbs Act": Page 4, lines 7 and 10; page 6, line 16; page 15, lines 15, 18 and 22; page 17, lines 1, 5 and 11; page 18, line 21; page 22, line 8; page 27, line 23; page 28, lines 2, 4, 8-9 and 12. UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 91-1769 UNITED STATES OF AMERICA, Appellee, v. FRANK ORETO, SR., Defendant, Appellant. ____________________ No. 91-1770 UNITED STATES OF AMERICA, Appellee, v. FRANK ORETO, JR., Defendant, Appellant. ___________________ No. 91-1771 UNITED STATES OF AMERICA, Appellee, v. DENNIS PETROSINO, Defendant, Appellant. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. David S. Nelson, U.S. District Judge] ___________________ ____________________ Before Torruella, Circuit Judge, _____________ Campbell, Senior Circuit Judge, ____________________ and Boudin, Circuit Judge. _____________ ____________________ Charles W. Rankin, by Appointment of the Court, with whom Rankin _________________ ______ & Sultan, Cornelius H. Kane, Jr, and Charles P. McGinty, Federal _________ _______________________ ___________________ Defender Office, were on consolidated brief for appellants. Sean Connelly, Department of Justice, with whom Donald K. Stern, ______________ _______________ United States Attorney, Ernest S. DiNisco and Todd E. Newhouse, ___________________ __________________ Assistant United States Attorneys, were on brief for the United States. ____________________ October 4, 1994 ____________________ BOUDIN, Circuit Judge. Frank Oreto, Sr., Frank Oreto, ______________ Jr., and Dennis Petrosino ("the appellants") challenge their convictions on a number of charges arising out of an alleged loansharking ring operating in Revere, Massachusetts. We affirm. I. BACKGROUND The appellants were charged in June 1987 in an indictment with offenses under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. 1962, as well as offenses involving the making of extortionate loans or collection by extortionate means. 18 U.S.C. 892, 894 (the extortionate credit transactions or "ECT" statute). The original indictment was 137 pages long, contained 82 counts, and named several other defendants besides the three who are parties to this appeal. The structure of the charges is of some importance. Count 1 alleged a RICO conspiracy involving all of the indicted defendants. The alleged predicate acts were 74 specific instances of extortionate lending or collection transactions in violation of 18 U.S.C. 892, 894, and 62 ___ specific instances of usurious lending as defined in 18 U.S.C. 1961(6). Count 2 charged each of the indicted defendants with a substantive RICO violation and realleged the same conduct as predicate acts. Counts 3 through 76 then alleged each of 74 extortionate lending or collection -7- -7- transactions as individual conspiracies to violate 18 U.S.C. 892, 894, or--in ten instances--as individual extortionate collections by Oreto, Sr. in violation of the latter statute. (Counts 76-82 involved mail fraud charges against indicted defendants other than the three appellants.) Oreto, Sr., was named in most of the 74 transactions that formed the basis for the RICO conspiracy, the substantive RICO offense, and the 74 separate ECT statute counts. Oreto, Jr., and Petrosino were also named in the RICO conspiracy and RICO substantive counts and in a limited number of the 74 transactions and the corresponding ECT statute conspiracy counts. All three of the appellants appeared in various of the 62 usurious loan transactions that were also alleged predicate acts in counts I and II but were not charged as separate conspiracies or substantive crimes in any other count. One of the defendants named in the indictment was severed and tried separately. See United States v. Weiner, 3 ___ _____________ ______ F.2d 17 (1st Cir. 1993). Several other defendants disappeared from the case for reasons not stated in the briefs; at least one pleaded guilty and testified against those who stood trial. The three appellants in this case were tried together in a 143-day trial. At trial the government offered seized records of loans and borrowers, court-authorized wiretap recordings, and testimony by -8- -8- cooperating co-conspirators and individuals who had borrowed money from Oreto, Sr. We state the facts in the light most favorable to verdicts being appealed. Weiner, 3 F.2d at 19. ______ So viewed, the evidence permitted a reasonable jury to find the following. Oreto, Sr. headed an enterprise which made loans to over three hundred borrowers at weekly interest rates of from three to seven percent. Those weekly rates translate into annual interest of from 156 to 364 percent; the maximum legal rate in Massachusetts, by contrast, is 20 percent annually. Mass. Gen. Laws. ch. 271, 49. Oreto, Jr. and Petrosino served as collectors for the loansharking operation. Over two dozen borrowers testified, various of them asserting that Oreto, Sr. and his accomplices used threats and intimidation to ensure payment of the loans. The loansharking business was conducted from various locations in or near Revere including both Oreto, Sr.'s home and a function hall in which Oreto, Sr. was a silent partner. The documentary evidence included the organization's "Bible," its master list of borrowers, debts, salaries and expenses. "Frank, Jr.," and "Dennis" were listed among those who received weekly salaries. Much of the trial was given over to testimony by borrowers whose loans were corroborated by entries in the Bible. These witnesses testified that Oreto, Sr. employed tall, physically imposing men--Petrosino, for example, is described -9- -9- in the record as between 6'1" and 6'2" tall and over 250 pounds in weight--to call upon delinquent borrowers and threaten them--implicitly or explicitly--with physical harm if the loans were not repaid. At least two witnesses testified that they were physically assaulted by Oreto, Sr.'s collectors, and many more borrowers testified that they believed that harm would come to them if they failed to make their payments. The jury convicted each of the appellants on one count of conspiring to violate RICO, 18 U.S.C. 1962(d), as well as one substantive RICO count. 18 U.S.C. 1962(c). In addition, Oreto, Sr. was convicted on 35 counts of conspiring to collect loans by extortionate means, 18 U.S.C. 894; ten counts of making extortionate loans, 18 U.S.C. 892; and three counts of conspiring to make extortionate loans. Id. ___ The jury also convicted Oreto, Jr. on four counts, and Petrosino on seven counts, of conspiring to collect loans by extortionate means. At a later date, Oreto, Sr. was sentenced to 20 years imprisonment on the RICO counts, to run concurrently with 15 year sentences on the individual ECT statute counts but consecutively to a life sentence he was then serving in Massachusetts state prison for second degree murder. Oreto, Jr. and Petrosino were sentenced to 6 years and 10 years imprisonment, respectively, on each count of -10- -10- conviction, with all sentences to run concurrently. These appeals followed. II. THE MISCONDUCT CLAIMS Appellants' first argument on appeal is that they were prejudiced by prosecutorial misconduct involving in-court identifications of them by a series of former borrowers. The first indication of such misconduct occurred on March 29, 1990--three months into the trial--when an assistant United States attorney asked John Doherty, a Revere fireman alleged to have borrowed money from Oreto, Sr., to make an in-court identification. Doherty had testified that a man named "Dennis" had visited him on one occasion at work but, when asked to identify Dennis, Doherty erroneously pointed to Oreto, Jr. On cross-examination, Doherty testified that he had been told prior to entering the courtroom that the government wished him to identify Petrosino, and that the seating arrangement of the appellants at their counsel tables had been described to him by an FBI agent who had been assisting the prosecutors at trial. Doherty's confusion appears to have arisen from the fact that there was more than one defense table. Oreto, Jr. was sitting in the same position at his table as Petrosino--the second seat from the right--but at a different table. The defense moved for a mistrial and requested a hearing on the issue. -11- -11- At a hearing beginning on April 2, 1990, the FBI agent acknowledged that he had told Doherty the seating arrangement of appellants prior to Doherty's entry into the courtroom. This was done ostensibly for the purpose of reducing the witnesses' nervousness by familiarizing them with the courtroom layout. The agent also admitted conveying the seating arrangement to two other witnesses. One was Joseph Gazza, who had testified prior to Doherty and identified Oreto, Sr., and the other was Michael DiCarlo, whom the government chose not to call. Two other witnesses testified at the hearing that they had known where the defendants would be sitting: Ronald Filipowich, who identified Oreto, Sr., and Frank Anderson, who identified both Oreto, Sr. and Petrosino. Anderson, however, said that he had such knowledge only because his experience as a police officer, and Filipowich said that he knew only that the defendants would be sitting in the "back" of the courtroom. Later on, in May 1990, an additional witness, Dennis Willcox, admitted that the FBI agent had told him the courtroom seating arrangements two or three months earlier. Willcox, however, was never asked to identify anyone. Following the hearing, the district court denied defendants' motions for a mistrial and instructed the jury as follows: -12- -12- Four witnesses--Mr. John Doherty, Mr. Joseph Gazza, Mr. Frank Anderson, Mr. Ronald Filipowich--gave testimony in the case before you. Each was asked to identify Mr. Frank Oreto, Sr., and each gave a reply. Prior to that session the Government team told Mr. Doherty, Mr. Gazza, Mr. Anderson, and Mr. Filipowich the seating arrangements of the defendants. Now, you must be instructed as to the following: First, identification is an essential element that the Government must prove beyond a reasonable doubt. 2. You are to consider that evidence that seeks to prove that, and you must carefully weigh the testi- mony in determining what weight you shall give that testimony as you review it in your deliberations. Suggestions as to identification may [a]ffect an in Court identification by making it the result of the suggestion rather than that which the witnesses actually saw or observed. Your responsibility is to determine from all the evidence whether or not the identifications made by the witnesses were based on their own actual knowledge and memory, and not on information provided them about the seating positions of the defendants provided by the Government. Therefore, you may consider the fact that the Gov- ernment told the witnesses Doherty, Gazza, Anderson, and Filipowich about the seating arrangements of the defendants, and of Mr. Oreto, Sr. in particular, as you go about deciding how much weight and relevance you will give to those in Court identifications. The district court's final charge to the jury included a similar instruction. The court rejected the defense's objections to this instruction, as well as alternative instructions proffered by defense counsel. Appellants now contend that the government's conduct required a mistrial. Ordinarily, we will reverse a district -13- -13- court's denial of a motion for a mistrial only for an abuse of discretion. E.g., United States v. Castiello, 915 F.2d 1, ____ _____________ _________ 3 (1st Cir. 1990), cert. denied, 498 U.S. 1068 (1991). The ____________ government assumes, solely for purposes of this appeal, that the revelation of defendants' seating arrangements to identification witnesses was improper. It argues, however, that there was no prejudice to any of the appellants. We think this assertion is clearly correct with respect to Oreto, Jr., who was not identified by any of the witnesses who were told of the seating arrangement. It is equally evident that Petrosino was not harmed by the allegedly "staged" identifications: Doherty's misidentification of Oreto, Jr. as Petrosino can have only undermined the government's case against Petrosino. The only other disputed identification of Petrosino--by Anderson--occurred in connection with a count upon which Petrosino was not convicted. The identifications of Oreto, Sr. present a slightly more difficult problem. Four of the five arguably tainted witnesses pointed out Oreto, Sr. for the jury, and Oreto, Sr. was convicted on three of the four counts to which those witnesses testified. This court must therefore determine whether the identification procedure was impermissibly suggestive, and, if so, whether the identifications were nonetheless reliable under all of the circumstances. E.g., ____ -14- -14- United States v. Gray, 958 F.2d 9, 13-14 (1st Cir. 1992). On _____________ ____ the latter issue, we conclude that the identifications of Oreto, Sr. made were sufficiently reliable and the curative instructions were such that a mistrial was not required. This is not a case in which a marginal identification-- e.g., by a witness who only glimpses the perpetrator of a ____ crime--has been bolstered by improperly suggestive identification procedures. See Neil v. Biggers, 409 U.S. ___ ____ _______ 188, 199-200 (1972). Here, the witnesses identifying Oreto, Sr. had dealt with him on numerous occasions and without any attempt by Oreto, Sr. to mask his identity. These dealings were corroborated by documents seized by the government. Indeed, Oreto, Sr. did not claim that someone else had made the loans in question, but rather that those transactions had never involved threats or violence. Finally, defense counsel were given ample opportunity to explore the defects in the identification procedure on cross-examination and argue those defects to the jury in summation. Appellants also assert that the trial court improperly foreclosed inquiry into "continuing misconduct in the identification process" by the government. Specifically, they argue that the court should have ordered Doherty, Gazza, Anderson, and Filipowich to return to the stand after the hearing in order to determine whether any part of their testimony remained untainted. Appellants do not explain what -15- -15- they would have asked these witnesses during such further testimony, over and above the thorough cross-examination conducted during the witnesses' initial testimony. One assistant United States attorney testified at the April 2 hearing. Appellants complain that a second prosecutor, who was co-counsel at the trial, should have been ordered to testify. This testimony appears to have been sought only to clarify certain details as to what information was given to which witnesses. The government has asked us, as it asked the trial court, to resolve all of these ambigu- ities in the defense's favor and assume that each such witness was told exactly where each defendant would be sitting. The additional testimony sought by appellants could not have given them more. Appellants next say that the similar wording in testimony given by several witnesses regarding the fear element of the extortion counts may have indicated additional government "coaching" of witnesses, and that the trial court frustrated efforts to inquire into such misconduct. Several of the witnesses testified that they feared that "harm would come to them" if they did not repay their loans. Appellants say that this syntax as unnatural, suggesting that its source lay with the prosecution rather than the natural recollection of the witnesses involved. -16- -16- A number of other witnesses testified using entirely different formulations, and the fear element was amply supported by additional evidence. Debtor Lloyd Plotkin, for example, stated in an intercepted conversation with John Costa, a manager in the loanshark organization, that he was "afraid" of being "hit" and "slapped" by Oreto, Sr. Similar- ly, other debtors testified at trial that violent means had actually been employed against them. The defense had an adequate opportunity on cross-examination to explore any misconduct that might discredit the witnesses, and no further fishing expedition was required. The appellants also complain that they were not allowed to call the assistant United States attorneys trying the case as trial witnesses to testify about misconduct in the identification process. A defendant must establish a "compelling need" before being allowed to call a prosecutor as a trial witness, a step that will usually require the prosecutor to step aside. United States v. Angiulo, 897 F.2d _____________ _______ 1169, 1194 (1st Cir.), cert. denied, 498 U.S. 845 (1990). _____________ Here, the court dealt with the suggestive identifications through the hearing and instructions. We think that this was sufficient.1  ____________________ 1When the prosecutor testified at the April 2 hearing, he disclosed that Doherty had described the individual named "Dennis" who visited him at work--allegedly, Petrosino--as large, dark-haired and "Irish looking." Petrosino argues that the government violated Brady v. Maryland, 373 U.S. 83 _____ ________ -17- -17- Appellants further contend that, in his closing arguments to the jury, one of the prosecutors effectively testified himself by saying, as to the tainted identifi- cations, "Nobody attempted to cover it up, ladies and gentlemen. Nobody lied." This was mild vouching, but we see the statement as essentially harmless, especially in light of the defense's repeated attempts to magnify the alleged government misconduct and make it the focus of the case. Reversal is not automatically required where improper remarks by prosecutor are isolated and made in response to specific attacks by defense counsel. United States v. Machor, 879 _____________ ______ F.2d 945, 956 (1st Cir. 1989), cert. denied, 493 U.S. 1081 ____________ (1990). At the close of the evidence, the defense proffered two proposed instructions to be given by the trial court regarding government misconduct in the identification process. The first of these stated in part as follows: It is improper for the government to tell a witness where a defendant is sitting in the courtroom. I have found that such conduct occurred here on four specific occasion, affecting the testimony of Mr. Doherty, Mr. Gazza, Mr. Anderson and Mr. Filipowich. I now instruct you that attempts by "the Government team" . . . to conceal or make up evidence, or to influence witnesses to testify favorably to the government, may be considered by  ____________________ (1963), by failing to disclose Doherty's prior description to the defense (so it could point out that Petrosino did not look Irish). We agree with the district court that in the context of this case the supposed characterization was too vague to qualify as exculpatory under Brady. _____ -18- -18- you as reflecting an attempt to unfairly convict a defendant. . . . . You must consider the number and extent of efforts to change or influence witnesses' testimony. To do this, you must evaluate the testimony of each wit- ness in this case, deciding whether any tampering may have affected each and every identification as well as any other evidence you have heard or re- viewed during the trial. Evidence of such tampering alone may create a reasonable doubt of the defendant's guilt. A second proposed instruction concluded by stating that "[i]f such government misconduct together with any other facts adduced in support of this defense creates in your mind a reasonable doubt of guilt of these charges, then you must find the defendants not guilty of these charges." Both of the proposed instructions invited the jury to acquit the defendants primarily or solely on the basis of misconduct by the government. Here, as in an earlier case "[the] facts making up the theory, if believed, [would] not defeat the factual theory of the prosecution." United States _____________ v. Silvestri, 790 F.2d 186, 192 (1st Cir.), cert. denied, 479 _________ ____________ U.S. 857 (1986). Putting the government on trial is a favorite strategy of defense counsel, but it is not an exculpatory theory which the defense is entitled to have the judge formally present to the jury. See United States v. ___ _____________ Porter, 764 F.2d 1, 14 (1st Cir. 1985).  ______ III. THE MERITS AND RELATED ISSUES -19- -19- Our discussion of the merits begins with the ECT statute counts which, although listed later in the indictment, were incorporated in the RICO counts as potential predicate acts. Most of the ECT statute counts charged individual conspiracies either to make extortionate extensions of credit or to collect such extensions by extortionate means. Appellants now claim that they were improperly charged and convicted of multiple ECT statute conspiracies, whereas in reality there were no distinct agreements separate from a single overall loansharking conspiracy. We have said that "[w]hether a given body of evidence is indicative of a single conspiracy, multiple conspiracies, or no conspiracy at all is ordinarily a matter of fact." United ______ States v. David, 940 F.2d 722, 732 (1st Cir.), cert. denied, ______ _____ ____________ 112 S. Ct. 605 (1991). It is true that if no reasonable jury could on the evidence presented find the multiple conspiracies charged, then a judgment of acquittal would be warranted. It is a "heavy burden" to show that the evidence precludes the findings made by the jury. United States v. _____________ Innamorati, 996 F.2d 456, 469 (1st Cir.), cert. denied, 114 __________ _____________ S. Ct. 409 (1993). Appellants here do not even try to carry that burden. Much of the trial was consumed by government evidence directed to individual transactions. The appellants' brief does no more with the evidence than point to connections -20- -20- between the credit transactions, including similarity of methods, overlap of personnel, a general time frame, and common locations. These factors might have justified the jury in finding only one large conspiracy. They hardly show that the jury could not find the requisites of smaller individual conspiracies: a specific agreement, and the required intent, as to each loan transaction. The appellants' brief quotes from statements by government counsel to the jury, arguing that the evidence shows the connections necessary to prove the overarching RICO conspiracy charged in count 1. But the requirements for a RICO conspiracy are different than the requirements for a ECT statute conspiracy, whether the latter relates to a single transaction or one that embraces a number of transactions. Here there is no inconsistency in the government arguing that--in addition to the RICO conspiracy--individual ECT statute conspiracies have also been proved. The second branch of appellants' multiplicity argument is an attack on the jury instructions. Appellants say that even if the evidence permitted a finding of separate conspiracies, the defense was entitled to instructions that set forth the defense theory that there was (at most) only one ECT statute conspiracy. Further, they say, the court was obliged to give the jury guidance, as reflected in proposed defense instructions, on how to distinguish between one large -21- -21- conspiracy and several smaller ones. The two instructions in question--numbers 12A and 23--are lengthy and overlapping; the former is concerned with RICO and the latter with the ECT statute. The district court gave neither. In substance, each of the requested instructions asks the jury to determine "whether two or more charged conspiracies are really the same offense"; both set forth the multiple factor test that this and other courts have used in considering double jeopardy claims in the conspiracy context; and both refer to the possibility that the jury could find "that the multiple conspiracies charged in the indictment were not separate and distinct." One of the instructions cited United States v. Gomes-Pabon, 911 F.2d 847, 860 (1st _____________ ___________ Cir.), cert. denied, 498 U.S. 1074 (1991), which discussed _____________ the multi-factor test. It is common practice, especially in drug cases, for the government (because of various procedural advantages that inhere) to charge a single large conspiracy. In turn, the defendants often claim that, at worst, only smaller (often uncharged) conspiracies existed. Where requested, trial courts may then give a so-called multiple conspiracies charge, inviting the jury to consider the possibility that the large conspiracy has not been proved but instead that only smaller conspiracies may have been shown. 1 L. Sand, J. Siffert, W. Loughlin & S. Reiss, Modern Federal Jury _______________ ____ -22- -22- Instructions 19-01, at 19-24 to 19-34.3 (1993). See ____________ ___ generally Kotteakos v. United States, 328 U.S. 750, 773-74 _________ _________ ______________ (1946). By contrast, we are concerned here with the defense proposing an instruction that contemplates a larger single conspiracy. The government thinks that it is enough, in this case, that the jury was properly instructed on the elements of each type of conspiracy charged (namely, the RICO conspiracy and the various ECT statute conspiracies), and that the jury was also told to acquit if it found that a conspiracy as charged had not been proved. It quotes from the district court's instructions: If you find that any defendant participated in a conspiracy but it was different from those charged in the indictment, that determination would provide no basis for finding that defendant guilty of the offense charged. If you find that the conspiracy charged did not exist, then you must return a verdict of not guilty even though you find that some other conspiracy did, in fact, exist. The government concludes that "[i]f an individualized conspiracy is established, it is not a legitimate defense that the defendant engaged in a broader conspiracy involving multiple victims." This position has some appeal, but it does not entirely meet the reality that a jury's choice may be influenced by the alternatives presented. Thus, "[a]n accused is entitled to an instruction on his theory of defense so long as the -23- -23- theory is a valid one and there is evidence in the record to support it." United States v. Rodriguez, 858 F.2d 809 (1st ______________ _________ Cir. 1988). Similarly, a defendant has a right to a lesser included offense charge, where the evidence would permit a jury to find that only a lesser included offense occurred. E.g., Keeble v. United States, 412 U.S. 205 (1973). If such ____ ______ _____________ instructions were warranted but nevertheless omitted, it would not be an answer to say that the jury convicted and that the evidence was sufficient to support the conviction. The question what a district court should tell a jury, where multiple conspiracies are charged but the defense urges a single large conspiracy, is a difficult one and is probably not susceptible to an abstract answer unrelated to context. One reason is that quite different situations may be presented: for example, the colorable "single large conspiracy" might in one case be an entirely different entity with different actors and objectives and, in another, be nothing more than a different characterization of the very same acts charged as multiple conspiracies. In the former case, the charge in the two indented paragraphs quoted above would probably protect the defendants pretty effectively even without a specific reference to a "single" conspiracy. Our situation is more akin to the latter case. At best, the defendants have engaged in a series of transactions that could be viewed as a set of separate conspiracies, or one -24- -24- overall conspiracy embracing numerous wrongful transactions, or (putting double jeopardy issues to one side) both an ____ overarching conspiracy and a nest of underlying smaller conspiracies. Partly this is a problem of proof and inference; partly the problem arises from trying to squeeze into the conceptual cubbyhole of "an agreement" activities that in practice often have the more shapeless character of an evolving joint criminal enterprise. See United States v. ___ _____________ Sepulveda, 15 F.3d 1161, 1191 (1st Cir. 1993), cert. denied, _________ ____________ 114 S. Ct. 2714 (1994); United States v. Moran, 984 F.2d _____________ _____ 1299, 1300 (1st Cir. 1993). In all events, in such a case as ours we do not think that a defendant--even if arguably entitled to a "single ____ conspiracy" instruction--is entitled to what the defense sought here, namely, a direction to the jury to acquit if it finds that the "two or more charged conspiracies are really the same offense." If the various charged conspiracies are really parts of the same conspiracy, then at worst the ____ defendant has been charged twice or more with the same offense and can be convicted (or at least punished) only for one conspiracy. Cf. Ball v. United States, 470 U.S. 856, ___ ____ _____________ 864-65 (1985). An outright acquittal on all counts would be miscarriage of justice. Both of the instructions sought here are fundamentally flawed because they sought a direction to the jury to acquit -25- -25- if it found a single conspiracy. The law is well settled, and for rather obvious reasons, that the district judge is not required to edit a proposed instruction to delete the bad and preserve the good. United States v. Flaherty, 668 F.2d _____________ ________ 566 (1st Cir. 1981); United States v. Leaching, 427 F.2d 1107 _____________ ________ (1st Cir. 1970). Rather, to preserve an ordinary claim of error based on the refusal to give an instruction, counsel must proffer a substantially correct statement of the law. The acquittal direction alone makes the defense instructions improper in the context of this case. The request for a "single conspiracy" instruction is likely to be rare. Usually, as already noted, the government presses this theory and the defense resists; it was sought by the defense here because the defense thought (mistakenly, as we explain below) that a single conspiracy would insulate the defendants against a RICO conviction. Accordingly, we think that we can properly put off to another day the very difficult problem of deciding whether and when such a single conspiracy instruction should be given, a problem fraught with practical difficulties in explaining matters to the jury as well as the theoretical ones to which we have adverted. One other general claim of error relating to the ECT statute counts remains to be considered. In order to prove that an extension of credit was extortionate under 18 U.S.C. 892, the government was obligated to prove that the debtor -26- -26- (as well as the defendant) believed that the debt might be collected, or that nonpayment might be punished, by extortionate means, that is, by violence or other harmful criminal means. 18 U.S.C. 891(b). This element was contested at trial. Over defense objection, the trial court allowed one of the alleged loanshark borrowers, Joe Gazza, to testify that he knew Oreto, Sr. "got out of jail for murder." This testimony was elicited by the government on redirect, after Gazza admitted on cross-examination that he had never been directly threatened. The redirect was admitted by the trial court solely for the purpose of showing a basis for Gazza's fears that Oreto, Sr. might resort to violence to ensure repayment. Appellants now challenge the trial court's admission of the testimony, noting its highly prejudicial nature and the lack of any connection between the prior murder and Oreto, Sr.'s alleged loansharking activities. Appellants' argument is largely foreclosed by our decision in United States v. DeVincent, 546 F.2d 452 (1st ______________ _________ Cir. 1976). In that case, which also involved allegations that the defendant made extortionate extensions of credit in violation of 18 U.S.C. 892, the trial court admitted testimony regarding the defendant's twenty-year-old conviction for armed robbery and his ten-year-old murder indictment. Upholding this decision, Judge Coffin explained: -27- -27- Neither of the events could be admitted to show that DeVincent was a bad man. If known to the debtor, however, they can be admitted to show an element of the crime--the understanding of the debtor that default would be punished with violence. The debtor's awareness of the lender's earlier conviction, or even indictment, for a violent crime surely affects his view of the lender's likely collection practices. 546 F.2d at 456-57. DeVincent clearly holds that a prior conviction for a _________ violent crime--even one wholly unrelated to the defendant's lending activities--may, if known to a debtor, influence the latter's reasonable expectations as to how the lender may collect the loan. It is true that the ECT statute itself permits reputation evidence--usually a reputation for violence--in more restricted situations. See 18 U.S.C.  ___ 892(c), 894(c). But these provisions do not explicitly bar evidence of specific prior bad acts, as permitted under Fed. R. Evid. 404(b), when offered to show the basis for a victim's fear, and cases besides DeVincent have followed that _________ course. The weighing of prejudice against probative value is otherwise largely for the trial court, see Fed. R. Evid. 403, ___ and no abuse of discretion has been shown here. We next consider several general attacks on the RICO convictions. The RICO statute makes it a crime for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, -28- -28- in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. 1962(c). The district court gave the following instruction on the meaning of "conduct or participate . . . in the conduct of" an enterprise under the statute: The term "conduct" and the term "participate in the conduct of" an enterprise include the performance of acts, functions or duties which are necessary to or helpful in the operation of the enterprise. A person may be found to conduct or to participate in the conduct of an enterprise even though he is a mere employee having no part in the management or control of the enterprise and no share in the prof- its. In Reves v. Ernst & Young, 113 S. Ct. 1163 (1993), the _____ _____________ Supreme Court held that an outside accounting firm employed by an enterprise was not subject to civil RICO liability unless it "participate[d] in the operation or management of the enterprise itself." Id. at 1173. Relying on Reves, ___ _____ Oreto, Jr. and Petrosino argue that "mere employees" by definition do not participate in the "operation or manage- ment" of the enterprise. It is true that in Reves the Court _____ expressly declined to decide "how far 1962(c) extends down the ladder of operations." 113 S. Ct. at 1173 n.9. Further, the Court observed that "some part in directing the ____ enterprise's affairs is required." Id. at 1170. ___ Reves is a case about the liability of outsiders who may _____ _________ assist the enterprise's affairs. Special care is required in translating Reves' concern with "horizontal" connections-- _____ -29- -29- focusing on the liability of an outside adviser--into the "vertical" question of how far RICO liability may extend within the enterprise but down the organizational ladder. In our view, the reason the accountants were not liable in Reves _____ is that, while they were undeniably involved in the enterprise's decisions, they neither made those decisions nor carried them out; in other words, the accountants were outside the chain of command through which the enterprise's affairs were conducted. The government did not show that Oreto, Jr. or Petrosino participated in the enterprise's decisionmaking; but they and other collectors were plainly integral to carrying out the collection process. Reves defines "participate" as "to take _____ part in," 113 S. Ct. at 1170, and nothing in the Court's opinion precludes our holding that one may "take part in" the conduct of an enterprise by knowingly implementing decisions, as well as by making them. Indeed, the Court said that "[a]n enterprise is `operated' not just by upper management but also by lower-rung participants in the enterprise who are under the direction of upper management." 113 S. Ct. at 1173 _________ (emphasis added). Congress declared in RICO that the statutory purpose was "to seek the eradication of organized crime in the United States" and Congress listed "loan sharking" as a means by which "organized crime derives much of its power." See Pub. ___ -30- -30- L. 91-452, 1 (Statement of Findings and Purpose following 18 U.S. C. 1961). RICO also provides expressly that "collection of unlawful debt" is a predicate for RICO liability. This conduct is precisely what the government charged, and the jury found, was engaged in by the present appellants. We think Congress intended to reach all who participate in the conduct of that enterprise, whether they are generals or foot soldiers.2 Appellants have also challenged a second aspect of the RICO instructions. A defendant may violate RICO by participating in either a "pattern of racketeering activity" or "collection of unlawful debt." 18 U.S.C. 1962(c). The racketeering prong of the statute requires, at a minimum, "at least two acts of racketeering activity . . . ." 18 U.S.C. 1961(5). In this case, the predicate acts specified in the indictment against Oreto, Jr. and Petrosino were conspiracies to collect individual loans by extortionate means in violation of 18 U.S.C. 894. See 18 U.S.C. 1961(1)(B) ___ (specifying violations of 18 U.S.C. 891-94 as valid predicate acts under RICO).  ____________________ 2Appellants also claim prejudice from the district court's failure to complete its explanation of the "association with or employment by the enterprise" element of 1962(c) after an interruption. Appellants have not explained how they were harmed by the omission and the language apparently omitted would have been primarily helpful to the government. -31- -31- Appellants objected to the trial court's instruction that the jury could find a pattern of racketeering activity if the appellants committed or aided and abetted the __ commission of at least two of the specified racketeering acts. Our court has observed that "[a]iding and abetting is an alternative charge in every count, whether explicit or implicit," United States v. Sanchez, 917 F.2d 607, 611 (1st _____________ _______ Cir. 1990) (internal quotations omitted), cert. denied, 499 ____________ U.S. 977 (1991), and it appears that most if not all courts to consider the issue have held that a defendant may be convicted of aiding and abetting a conspiracy. See, e.g., ___ ____ United States v. Gonzalez, 933 F.2d 417, 444-45 (7th Cir. _____________ ________ 1991); United States v. Portac, Inc., 869 F.2d 1288, 1293 _____________ ____________ (9th Cir. 1989), cert. denied, 498 U.S. 845 (1990). ____________ Oreto, Jr. and Petrosino also argue that because there was only a single ECT statute conspiracy involving these appellants, the government failed to prove the two predicate ___ acts necessary for a pattern of racketeering. 18 U.S.C. 1961(5). Contrary to appellants' hopes we do not see why the possibility of a single ECT statute conspiracy (and it is only that) should infect the RICO convictions. Quite apart from other possible answers, we think it is enough that the specific ECT statute conspiracies charged as predicate acts of racketeering were each also conspiracies to make ____ extortionate loans or collect loans by extortionate means. -32- -32- This court has already held in Weiner that one such ECT ______ statute conspiracy is enough for a RICO violation because the pattern requirement does not apply to the collection of unlawful debt. Even if the jury had convicted only on a single ECT statute conspiracy, the one charged in this case happens to suffice under the alternative prong of RICO. 18 U.S.C. 1962(c). We need not consider whether a single conspiracy shown to have embraced multiple acts of wrongdoing might also satisfy the racketeering prong where unlawful debt was not involved so that at least two racketeering acts were required. Confronting Weiner appellants argue that our ______ construction of section 1962(c) in Weiner renders the statute ______ unconstitutional. They say that requiring two predicate acts for one theory of liability but only one for a different theory violates the equal protection clause, apparently because one defendant may be found guilty more readily than another under the same statute. The statutory distinction employs no suspect classification nor burdens a fundamental right, so we must uphold the statute if the disparity is "rationally related to the State's objective." Harrah ______ Independent School District v. Martin, 440 U.S. 194, 199 ____________________________ ______ (1979) (per curiam). Congress could rationally have decided that collections of unlawful debt were central to the evils at which RICO was -33- -33- directed. Accordingly, it could rationally have chosen to make guilt more easily provable in unlawful debt cases than in cases involving other forms of racketeering activity. Whether this rationale was the actual motivation for the statutory distinction is irrelevant to our inquiry, see ___ Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 466 _________ __________________________ (1981), although Congress' statement of purposes (quoted above) gives some reason to believe that Congress did so reason. A due process argument advanced by appellants is equally without merit. In essence, they appear to argue that the "continuity plus relationship" test for a "pattern" under section 1962(c) is so inherently vague as to be unconstitutional. We rejected a similar argument in United ______ States v. Angiulo, 897 F.2d 1169, 1179-80 (1st Cir. 1990), ______ _______ holding that any vagueness challenge to section 1962(c) must show "that the meaning and scope of RICO's `pattern' element was unclear and vague" as applied to the defendants' conduct in the particular case. The appellants in the present case have not even attempted such a demonstration. Oreto, Jr. and Petrosino each challenge the sufficiency of the evidence to support their convictions on various counts of the indictment. Oreto, Jr. contends that there was insufficient evidence to support the jury's guilty verdicts both on the four counts of conspiracy to collect extensions -34- -34- of credit by extortionate means, 18 U.S.C. 894, and on the RICO counts. He argues that the first two conspiracy counts- -counts 10 and 14 of the indictment--cannot be sustained because neither of the alleged victims testified and the government failed to identify the voices on wiretap tapes used to secure the convictions. As to the wiretaps, both FBI Special Agent Gianturco and Massachusetts State Trooper Thomas Foley testified to their familiarity with the voices in question and identified the speakers on the tapes for the jury. Further, the illegal loans to Mario Singarella (count 10) and Gary Plotkin (count 14) were corroborated, by documentary evidence in the loanshark organization's 'Bible'; Daniel Forte, a cooperating co-conspirator, testified at trial as to Oreto, Jr.'s involvement in efforts to collect each loan. The evidence was more than sufficient. Oreto, Jr. challenges his conviction on count 67 of the indictment, involving extortionate collection of a loan to Joseph Brangiforte, on the ground that Brangiforte failed to identify Oreto, Jr. as the person Brangiforte repaid. There was ample other evidence, however, that Oreto, Jr. was involved with the Brangiforte loan: Brangiforte testified that he made a payment to Oreto, Jr. near the Wonderland MBTA station; the government produced wiretap recordings of Brangiforte and Oreto, Jr. discussing the loan; and Trooper -35- -35- Foley testified that he saw Brangiforte give Oreto, Jr. an envelope. Again, the evidence was sufficient. Brangiforte's inability to pick out Oreto, Jr. in the courtroom was fodder for jury argument, but is not in itself fatal to the conviction. See United States v. Doherty, 867 F.2d 47, 67 ___ _____________ _______ (1st Cir.), cert. denied, 492 U.S. 918 (1989). ____________ Oreto, Jr.'s challenge to count 16 presents a closer question. That count involved extortionate collection of a loan to Eleanor Kelley, and Oreto, Jr. claims his conviction was improper because "[t]here was simply no evidence that Eleanor Kelley . . . was in fear." The debtor's subjective fear is not itself an element of the offense under 18 U.S.C. 894, although actual fear may be pertinent evidence. "[I]t is the nature of the actions of the person seeking to collect the indebtedness, not the mental state produced in the debtor, that is the focus of the inquiry for the jury." United States v. Polizzi, 801 F.2d 1543, 1548 (9th Cir. _____________ _______ 1986). See generally 1 Sand, supra, 32.02, at 32-16.1. _____________ ____ _____ Here, the government offered evidence that Oreto, Jr. and two other strangers visited Kelley at her place of business in order to ask Kelley to contact Oreto, Sr. about the loan. The government also showed that the loan itself was grossly usurious. After a reading of the testimony as to the visit, we think that a reasonable jury could determine that the nature of the loan, its interest rate, and the -36- -36- appellants' collection methods were not of the sort commonly employed by legitimate lenders, and that the appellants' tactics carried an implicit threat of violence. Oreto, Jr. also argues that the government failed to demonstrate that he "participated in the management or control of the alleged enterprise" because the proof showed only that he "was a mere collector for a short period of time." There is no requirement that participation extend over a long period. Here, the evidence showed that Oreto, Jr. was directly involved in at least four transactions in connection with his father's loansharking enterprise. The evidence is sufficient to sustain both the substantive RICO and RICO conspiracy convictions. Petrosino also challenges his RICO convictions on evidentiary grounds, contending that the government proved only that he was "a collector paid $50 weekly for a bare five months" and that this is insufficient to show that he "participated in the operation or management of the enterprise itself." The statute requires neither that a defendant share in the enterprise's profits nor participate for an extended period of time, so long as the predicate act requirement is met. Petrosino participated in the collection of seven separate loans by extortionate means. Those actions are sufficient. -37- -37- Lastly, appellants objected at trial to the following instruction given by the trial court to define the concept of "reasonable doubt": A reasonable doubt is a real doubt, based upon reason and common sense after careful and impartial consideration of all the evidence in the case. A reasonable doubt does not mean beyond all doubt. Rather it means a doubt based upon reason. Appellants' challenge rests upon the Supreme Court's decision in Cage v. Louisiana, 498 U.S. 39 (1990), which held to ____ _________ equate reasonable doubt with an "actual substantial doubt" was constitutionally inadequate. Arguing that "real doubt" in the present instruction is equivalent to "substantial doubt," appellants now argue that their convictions must be reversed due to the faulty instruction. See Sullivan v. ___ ________ Louisiana, 113 S. Ct. 2078 (1993) (erroneous instruction on _________ reasonable doubt cannot be harmless error). The objection to the phrase "substantial doubt" is that it is ambiguous. If taken to mean "large" or something like it, the instruction may mislead the jury into thinking that a small but reasonable doubt is no bar to conviction. But the phrase would be "unexceptionable" if taken to mean that the doubt must be "something more than a speculative one." Victor v. Nebraska, 114 S. Ct. 1239, 1250 (1994). The term ______ ________ used here, "real," is not subject to the same ambiguity; its natural antonym is "unreal" or" imaginary," which are proper descriptions of what would not be a reasonable doubt. Id. at ___ -38- -38- 1250. Boilerplate might be preferable, but there was no error. Affirmed. ________ -39- -39-