Charlesetta BEARD, Plaintiff,

v.

WORLDWIDE MORTGAGE CORPORATION, et al., Defendants.

No. 04–2183–D/An.

United States District Court, W.D. Tennessee, Western Division.

Feb. 3, 2005.

Margaret R. Barr–Myers, Esq., Webb A. Brewer, Esq., Sapna V. Raj, Susan L. Ratner, Memphis Area Legal Services, Inc., Memphis, TN, for Plaintiff.

John S. Golwen, Esq., Ashley Swain Old, Husch & Eppenberger, LLC, Memphis, TN, for Defendants.

S. Thomas Anderson, Jackson, TN, pro se.

## ORDER GRANTING IN PART AND DENYING IN PART THE MOTION OF EQUITY TITLE AND ESCROW CO. OF MEMPHIS, LLC, AND STEVEN WINKEL TO DISMISS; AND GRANTING PLAINTIFF LEAVE TO AMEND THE COMPLAINT

DONALD, District Judge.

Before the Court is the motion of Equity Title and Escrow Company of Memphis, LLC ("Equity Title") and Steven Winkel ("Winkel") (collectively "Defendants") to dismiss the complaint of Charlesetta Beard ("Plaintiff") pursuant to Fed.R.Civ.P. 12(b)(6). Plaintiff asserts that Defendants violated 1) the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq.; 2) the Fair Housing Act ("FHA"), 42 U.S.C. § 3601, et seq.; 3) the Truth–in–Lending Act ("TILA"), 15 U.S.C. § 1601, et seq.; 4) the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601, et seq.; 5) the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691, et seq.; and 6) the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. § 47–18–101, et seq. Plaintiff additionally asserts state law claims for fraud, conversion, negligent misrepresentation, breach of fiduciary duty, breach of contract, conspiracy, and unconscionability. Defendants contend that the complaint should be dismissed because Plaintiff failed to sufficiently plead claims for violations of RICO, fraud, and conspiracy, and otherwise failed to state a claim upon which relief may be granted. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. For the following reasons, the Court grants in part and denies in part Defendants' motion to dismiss.

## I. FACTUAL ALLEGATIONS

Plaintiff, an African–American woman, asserts that Equity Title and Winkel, in conjunction with the remaining defendants in this case, engaged in conduct which constituted predatory lending practices and a predatory lending scheme. Plaintiff contends that all of the defendants acted in concert to lure unsuspecting and unsophisticated African–American homeowners into exploitative mortgage loans to purportedly consolidate debt and/or finance home repairs or home improvement work.[1]

In support of her claims, Plaintiff asserts, inter alia, that she bought a house in August 1993 for $73,900. Compl. ¶ 21. Plaintiff paid a down payment of approximately $30,000 for the house, with a remaining balance on the mortgage of $44,500. Id. Plaintiff remained current on her mortgage payments until March 2003. Id. ¶ 22.

In or about December 2002, Plaintiff heard an advertisement on radio station

---

1. As previously noted, Plaintiff's complaint includes claims for violations of RICO and for conspiracy. Accordingly, the factual allegations made in the complaint concerning all the defendants must be examined in order to analyze Defendants' arguments in support of their motion to dismiss.

WBBP, 1480 AM, from Worldwide Mortgage Corporation ("Worldwide") claiming that individuals could get "easy money," have "cash in [their] pocket[s] for Christmas," consolidate bills, and have home improvement work done on their homes. *Id.* ¶ 23. At that time, Plaintiff was in arrears two payments on her car loan. *Id.* ¶ 24. After hearing the advertisement, Plaintiff contacted Worldwide in order to get a loan to help her catch up with her car payments. *Id.* ¶ 25.

When Plaintiff called Worldwide, the woman who answered the telephone asked Plaintiff for her social security number and verified employment information. *Id.* ¶ 27. In or about January 2003, Worldwide informed Plaintiff that she had been "approved for a loan," and Plaintiff was given an appointment to meet with someone at Worldwide. *Id.* ¶ 29. When Plaintiff went to the appointment, Worldwide did not tell Plaintiff the amount of the loan, the interest rate, closing costs, any of the terms of the loan or that the loan was a refinance of her existing mortgage. *Id.* ¶ 30.

Later, Elnora Harris ("Harris") from Worldwide contacted Plaintiff, told her that she could save a lot of money by refinancing, and asked Plaintiff whether she needed any home improvement. *Id.* ¶¶ 32, 34. Plaintiff mentioned that she had considered installing vinyl siding. *Id.* ¶ 34. Plaintiff thought that by "refinancing" her mortgage loan she would, in essence, be serviced by another lender, not that she would have to pay new closing costs, have a new interest rate, pay a higher monthly

payment, and have new terms on her loan. *Id.* Harris additionally told Plaintiff that Worldwide offered a product that would permit her to make mortgage payments biweekly, a payment schedule that would reduce the term of her loan to 21 years. Plaintiff, however, only had 20 years left on her mortgage loan. *Id.* ¶ 35. Worldwide conducted the closing on March 18, 2003, at its offices. *Id.* ¶ 41. Plaintiff did not receive a good-faith estimate of closing costs as required by law prior to the closing or at anytime thereafter. *Id.* ¶ 40.

At the closing, four women, including Harris, were in the room with Plaintiff. *Id.* ¶ 42. During the closing, no one mentioned that Plaintiff had a right to cancel,[2] and Plaintiff does not believe that she was provided a copy of a Notice of the Right to Cancel as required by federal law. *Id.* ¶ 50. Plaintiff thinks that she signed the Statement of Non–Cancellation of Right of Rescission at the closing, along with the Notice of Right to Cancel, but it is undated. *Id.* ¶ 51. Additionally, Plaintiff believes that she signed the loan application at the closing, but the one given to her is not dated. *Id.* ¶ 53.

During the closing, Plaintiff asked to meet the attorney who was conducting the closing. Someone told Plaintiff that the attorney could not be there and that the documents that she signed would be couriered to the attorney. *Id.* ¶ 43. Equity Title is listed as the settlement agent for the transaction. To Plaintiff's knowledge, no one from Equity Title participated in or

---

**2.** Moreover, Worldwide did not inform Plaintiff that she would be charged $500 up-front by Economic Advantages Corporation ("EA") which would handle the biweekly payments, or that, thereafter, she would be charged a servicing fee each time a biweekly payment was made during the term of the loan. Compl. ¶ 36. The $500 fee also does not appear on the HUD–1 Settlement Statement or on any disbursement statements. *Id.* ¶ 37.

Worldwide did not tell Plaintiff that although EA collected the payments biweekly, EA only forwarded the payments once a month to PCFS. *Id.* ¶ 38. Furthermore, neither Worldwide nor any other party disclosed to Plaintiff that she was, in fact, making an extra mortgage payment every year or that EA collected interest on the monies paid to them every two weeks. *Id.* ¶¶ 38, 39.

conducted the closing. *Id.* ¶ 44. Likewise, to Plaintiff's knowledge no notary public from Equity Title was present to witness her sign any of the documents at the closing. *Id.* ¶ 45. On March 18, 2003, Winkel notarized the Deed of Trust, which bears Plaintiff's signature; however, Plaintiff has never met Winkel. *Id.* ¶ 47.

Plaintiff believes that $7,800, apparently intended to be used for home improvements to her home, was released immediately to Worldwide, prior to any work being done on Plaintiff's house.[3] *Id.* ¶ 52. The HUD–1 settlement statement, however, dated March 18, 2003, does not show the disbursement of $7,800 to Worldwide.[4] *Id.* ¶ 62. The HUD–1 statement further indicates that Plaintiff's existing mortgage with Bank of America in the sum of $39,171.92 was paid off and that Plaintiff received a new loan in the amount of $72,000. *Id.* ¶ 54. Plaintiff's unsecured loans with Arcadia for $6,329, Providian for $2,908, Sears for $440, Capital One for $435, and WFFNB for $225 were consolidated into the new mortgage loan. *Id.* ¶ 59. At the closing, Plaintiff received a stack of checks made out to various creditors and to Plaintiff herself. *Id.* ¶ 70. Plaintiff received three checks totaling $6,651.00; however, the HUD–1 statement shows that she received $15,742.94. *Id.* ¶ 60. The HUD–1 statement also shows that Worldwide received a $3,600 loan origination fee. *Id.* ¶ 61.

Equity Title received a document preparation fee of $195, a settlement fee of $195, an abstract title search fee of $210, notary fees of $10 and courier fees of $40. *Id.* ¶ 65. Additionally, the Loan Disbursement Statement reflects that $390 was paid to Equity Title for attorney fees, although this is not listed on the HUD–1 statement. *Id.* ¶ 66. Plaintiff asserts that the fees paid to Worldwide, EA, and Equity Title were not bona fide or reasonable. *Id.* ¶ 69.

Plaintiff believes that no one from Worldwide actually came to her home for the purpose of appraising it prior to approving Plaintiff for the loan. *Id.* ¶ 28. Likewise, neither Worldwide nor any other defendant provided Plaintiff with a good-

---

**3.** Plaintiff alleges that on March 19, 2003, the day after the closing, Harris and Ernest Wells, Jr., came to her home to inspect the house for the home improvement work. Compl. ¶ 81. Plaintiff asserted that she only wanted vinyl siding to be installed. *Id.* Apparently, two home improvement contracts, dated March 19, 2003, were drafted at that time. *Id.* ¶ 82. One of the contracts, which lists a total cost of $7,800, relates to putting vinyl siding on Plaintiff's home. *Id.* ¶ 82, Ex. F. The second contract indicates a cost of $11,800. *Id.* ¶ 82.

Worldwide had Plaintiff's house re-sided with vinyl siding. *Id.* at 83. Plaintiff complained to Harris about the color of the installed siding, and Harris had the siding replaced, but it was still the wrong color. *Id.* In or about October 2003, Plaintiff asked Worldwide for a price breakdown, which indicated that she was charged $5,340 for the vinyl siding, $200 for tearing off the "wrong" siding, $600 for reinstalling the wrong color siding again, and $660 in "administrative fees." *Id.* ¶ 84. Plaintiff believes that the

price breakdown/work description was back dated to March 28, 2003, as that is the date that appears on the form. *Id.*

Plaintiff further asserts that she believes that Worldwide, Home Tech Services ("Home Tech"), and Memphis Financial Services, Inc. ("MFS") solicit home repair business and originate loans to finance those repairs. Plaintiff asserts that Worldwide, Home Tech, and MFS are owned and operated by the same persons and are located next door to one another in a shopping center. *Id.* ¶ 86. Plaintiff contends that these entities target African–Americans. *Id.*

**4.** The closing attorney's disbursement sheet indicates that the "contract amount" of $7,800 that was supposed to be paid to Worldwide, plus $4,000 that also was originally scheduled to be paid to Worldwide, was later paid to Plaintiff. *Id.* ¶ 67. However, Plaintiff received three checks totaling $6,651.00. *Id.* ¶ 60.

faith estimate of closing costs as required by law prior to closing, or at any time thereafter. *Id.* ¶ 40. Moreover, Plaintiff did not understand until March 2004 that she had in fact refinanced her mortgage loan. *Id.* ¶ 26. On March 3, 2004, Plaintiff rescinded the consumer credit loan and "cancelled the home improvement contract" by sending Worldwide, EA, and PCFS notices. *Id.* ¶ 88. On March 18, 2004, Plaintiff filed the instant action asserting that the defendants' actions constituted predatory lending practices which resulted in violations of federal and state law. Plaintiff seeks monetary and equitable relief from the defendants, including Equity Title and Winkel.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) enables a defendant to file a motion to dismiss for a plaintiff's failure to state a claim upon which relief can be granted. Motions to dismiss under Fed.R.Civ.P. 12(b)(6) are designed to test "whether a cognizable claim has been pleaded in the complaint." *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir.1988). Dismissal under Fed.R.Civ.P. 12(b)(6) is appropriate when no set of facts exists which would entitle the plaintiff to recover. *Hammond v. Baldwin,* 866 F.2d 172, 175 (6th Cir.1989). Essentially, it allows the court to dismiss meritless cases which would otherwise waste judicial resources and result in unnecessary discovery. *See, e.g., Neitzke v. Williams,* 490 U.S. 319, 326–27, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

In reviewing a defendant's Rule 12(b)(6) motion to dismiss, a district court should construe the complaint in the light most favorable to the plaintiff and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief. *Meador v. Cabinet for Human Res.,* 902 F.2d 474, 475 (6th Cir.1990), *cert. denied,*

498 U.S. 867, 111 S.Ct. 182, 112 L.Ed.2d 145 (1990). If an allegation is capable of more than one inference, it must be construed in the plaintiff's favor. *Sinay v. Lamson & Sessions Co.,* 948 F.2d 1037, 1039–40 (6th Cir.1991).

A district court may not grant a defendant's Fed.R.Civ.P. 12(b)(6) motion to dismiss based on its disbelief of the plaintiff's factual allegations. *In Re Sofamor Danek Group, Inc.,* 123 F.3d 394 (6th Cir.1997), *cert. denied, Murphy v. Sofamor Danek Group,* 523 U.S. 1106, 118 S.Ct. 1675, 140 L.Ed.2d 813 (1998). It is not the court's function to weigh evidence or evaluate the credibility of witnesses. *Miller v. Currie,* 50 F.3d 373, 377 (6th Cir.1995). A court will not consider any disputed questions of fact at this stage. *Barnes v. Winchell,* 105 F.3d 1111, 1114 (6th Cir.1997). Rather, the court should accept all well-pleaded facts as true and not consider matters outside the pleadings. *Hammond,* 866 F.2d at 175.

The United States Supreme Court has held that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Neitzke,* 490 U.S. at 326–27, 109 S.Ct. 1827; *Lewis,* 135 F.3d at 405 (6th Cir.1998). Thus, the standard to be applied when evaluating a motion to dismiss for failure to state a claim is very liberal in favor of the party opposing the motion. *Westlake v. Lucas,* 537 F.2d 857, 858 (6th Cir.1976). Even if the plaintiff's chances of success are remote or unlikely, a motion to dismiss should be denied. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

## III. ANALYSIS

Defendants assert generally that the claims against them should be dismissed

because the complaint fails to allege that Defendants played a role in enticing Plaintiff to refinance her home or that Defendants had any involvement with the repairs which were made to Plaintiff's home. Defendants offer specific arguments to support the dismissal of each claim. The Court therefore will address each claim individually.

## A. RICO Claims

Defendants maintain that the Court should dismiss Plaintiff's claims under RICO raised pursuant to 18 U.S.C. § 1962(c) and (d), because the complaint does not establish a violation of 18 U.S.C. § 1962(c). Title 18, section 1962 of the United States Code provides in pertinent part:

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C. § 1962(c) and (d). To state a claim pursuant to 18 U.S.C. § 1962(c), a plaintiff must establish that 1) the defendants committed two or more predicate offenses; 2) an "enterprise" existed; 3) a connection existed between the pattern of racketeering activity and the enterprise; and 4) the plaintiff suffered an injury to business or property as a result. *VanDenBroeck v. CommonPoint Mortg. Co.*, 210 F.3d 696, 699 (6th Cir.2000); *Advocacy Org. for Patients and Providers v. Auto Club Ins. Assoc.*, 176 F.3d 315, 322 (6th Cir.1999). Defendants assert that Plaintiff failed to sufficiently plead an 18 U.S.C. § 1962(c) offense.

### 1. Predicate Offenses

Defendants first argue that Plaintiff has failed to plead with sufficient specificity the acts constituting the predicate offenses. In the complaint, Plaintiff alleges that Defendants violated the predicate offenses defined in 18 U.S.C. §§ 1341 and 1343. Section 1341 defines the criminal offense of mail fraud.[5] Section 1343 defines the criminal offense of wire, radio, and television fraud.[6]

5. Title 18, section 1341 of the United States Code provides:
 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.
 18 U.S.C. § 1341.

6. Title 18, section 1343 of the United States Code states:
 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representa-

■ The sufficiency of Plaintiff's claims for mail and wire fraud must be examined pursuant to the requirements set forth in Fed.R.Civ.P. 9(b). *Advocacy Org.,* 176 F.3d at 322. Rule 9(b) requires a plaintiff to plead fraud with particularity. Fed.R.Civ.P. 9(b). The particularity requirement has been interpreted to mean that a plaintiff must allege at a minimum "the time, place, and content of the alleged misrepresentation ...; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Coffey v. Foamex L.P.,* 2 F.3d 157, 162 (6th Cir.1993). Moreover, "allegations of fraudulent misrepresentation must be made with sufficient particularity and with a sufficient factual basis to support an inference that they were knowingly made." *Advocacy Org.,* 176 F.3d at 322 (quoting *Coffey,* 2 F.3d at 162).

■ In ruling upon a motion to dismiss pursuant to Fed.R.Civ.P. 9(b), however, a court must consider the policy of simplicity in pleading found in Fed.R.Civ.P. 8. *Michaels Bldg. Co. v. Ameritrust Co., N.A.,* 848 F.2d 674, 679 (6th Cir.1988). Rule 8 requires the plaintiff to provide a "short and plain statement of the claim" and "simple, concise, and direct" allegations. Fed.R.Civ.P. 8. The principal purpose for the Fed.R.Civ.P. 9(b) particularity requirement, when considered in context with Fed.R.Civ.P. 8, is to ensure that the defendant receives fair notice of the alleged misconduct or fraudulent acts of which the plaintiff complains in order to prepare a responsive pleading. *Michaels Bldg. Co.,* 848 F.2d at 679. Moreover, an exception to the particularity requirement of Fed.R.Civ.P. 9(b) exists when the relevant facts "lie exclusively within the knowledge and control of the opposing party." *Wilkins ex rel. U.S. v. State of Ohio,* 885 F.Supp. 1055, 1061 (S.D.Ohio 1995). In such a case, pleading upon information and belief is permissible, although the plaintiff must still plead a statement of facts upon which the belief is based. *Craighead v. E.F. Hutton & Co.,* 899 F.2d 485, 489 (6th Cir. 1990). A court should hesitate to dismiss an action when the facts underlying the claim are within the defendant's control, especially when no discovery has been conducted. *Michaels Bldg. Co.,* 848 F.2d at 680.

■ The Court will now determine whether the allegations pled by Plaintiff in support of the predicate offenses of mail fraud and/or wire fraud are sufficient to satisfy the particularity requirements of Rule 9(b). "The elements of mail and wire fraud are: 1) a scheme to defraud, and 2) use of the mails, or of an interstate electronic communication, respectively, in furtherance of the scheme." *Advocacy Org.,* 176 F.3d at 322. A scheme to defraud consists of "[i]ntentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the designed end." To allege intentional fraud, there must be "proof of misrepresentations or omissions which were 'reasonably calculated to deceive persons of ordinary prudence and comprehension.'" Thus, the plaintiffs must allege with particularity a "false statement of fact made by the defendant which the plaintiff relied on." The plaintiff must also allege "the facts

---

tions, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1343.

showing the plaintiff's reliance on the defendant's false statement of fact." Alternatively, the plaintiff may allege an omission on which he or she relied. *Kenty v. Bank One, Columbus, N.A.*, 92 F.3d 384, 389–90 (6th Cir.1996) (internal quotations and citations omitted).

Plaintiff asserts *inter alia* that the defendants engaged in the following activities as part of their scheme to defraud her. Worldwide ran an advertisement on the radio in which it claimed it could provide easy money to individuals. *Id.* ¶ 23. In January 2003, Worldwide approved Plaintiff for a loan which refinanced her existing mortgage. That mortgage, which was originally $45,000, had a remaining balance of approximately $40,000 at the time of the transaction. *Id.* ¶¶ 21, 54. Although the amount refinanced totaled approximately $72,000, Plaintiff received three checks totaling $6,651.00. Moreover, contrary to Plaintiff's assertion that she received checks totaling $6,651.00, the HUD-1 statement, prepared by Equity Title, indicates that Plaintiff was supposed to receive $15,742.94. *Id.* ¶ 60. At the March 18, 2003 closing, no one told Plaintiff that she had a right to cancel nor does Plaintiff believe that anyone provided her with a copy of a Notice of the Right to Cancel as required by federal law. *Id.* ¶ 50. Equity Title acted as the settlement agent for the transaction, although Plaintiff is unaware that anyone from Equity Title was actually present at or participated in the closing. *Id.* ¶ 44. On March 18, 2003, Winkel notarized the Deed of Trust, which bears Plaintiff's signature, even though Winkel was not present when Plaintiff signed the document. *Id.* ¶ 47. Plaintiff was told at the closing that the attorney could not be there and that the documents that she signed would be couriered to the attorney. *Id.* ¶ 43.

Equity Title received a document preparation fee of $195, a settlement fee of $195, an abstract title search fee of $210, notary fees of $10 and courier fees of $40, all of which were not bona fide or reasonable fees. *Id.* ¶ 65. Likewise, the Loan Disbursement Statement reflects that Equity Title received $390 for attorney fees, although this is not listed on the HUD-1 statement. *Id.* ¶ 66. Plaintiff further alleges that "Equity Title, acting on behalf of the enterprise, prepared the fraudulent settlement statements and the fraudulent closing documents." *Id.* ¶ 102. Moreover, the complaint asserts that "[t]he fraud in the settlement statements implicates all defendants who received funds, oversaw the closing, and/or prepared the closing documents, including but not limited to MFS, Home Tech, Worldwide, and Equity Title." *Id.* ¶ 103. With respect to Winkel's role in the alleged scheme, the complaint provides that Winkel "is a principal and a part owner of Equity Title...." *Id.* ¶ 11. Finally, Plaintiff generally alleges that "[a]ll Defendants engaged in a pattern of false representations, some oral and some in writing, to induce consumers to enter into these transactions, to obtain loan approval, and to make the loans more marketable in the secondary mortgage market by making it falsely appear that the values of properties are substantially greater than the principal indebtedness on the loan." *Id.* ¶ 105.

These allegations of fraudulent misrepresentations satisfy the first element of a claim for mail or wire fraud—the existence of a scheme to defraud. Specifically, the complaint indicates the parties to the alleged fraudulent scheme and the specific dates that certain alleged misrepresentations occurred. With respect to Equity Title and Winkel, who is alleged to be a principal and part owner of Equity Title, Plaintiff asserts that their preparation of the settlement statements and related documents, in addition to their alleged action or omissions, as the case may be, occurred

on the closing date of March 18, 2003, or shortly thereafter, as evidenced by Plaintiff's loan approval.

Moreover, the complaint contains sufficient allegations to notify Defendants of the alleged representations they made and how they are alleged to be false or misleading. As noted above, Plaintiff alleges that the settlement statements and related documents were prepared by Equity Title and/or Winkel, as principal and part owner of Equity Title. Thus, the information found in these documents are representations allegedly made by Defendants. As asserted in the complaint, among the alleged representations and omissions in the HUD–1 statement and/or settlement statements that are misleading are 1) the representation in the statement that indicates that the monetary sum of $15,742.94 was supposed to be received by Plaintiff and 2) the omission in the HUD–1 statement of fees and costs allegedly paid to some of the defendants. Based on these allegations, Plaintiff "ha[s] sufficiently alleged a misrepresentation or an omission that was reasonably calculated to deceive persons of ordinary prudence and comprehension." *Kenty*, 92 F.3d at 390.

Likewise, the above assertions made by Plaintiff sufficiently allege that Defendants' fraudulent intent was to receive and/or take fees and money to which Defendants were not legally entitled and/or did not legally deserve. Additionally, Plaintiff has sufficiently alleged that she relied on Defendants' purported misrepresentations because she made the loan payments, including paying fees to the defendants which were not indicated on the HUD–1 statement. Finally, the assertions discussed *supra* allege Plaintiff's injury, i.e., payment of fees and costs that may not have been owed by, or disclosed to, Plaintiff and/or nonreceipt of moneys that may have been owed to Plaintiff. The Court finds that these allegations establish

the first element of mail and wire fraud—a scheme to defraud. Moreover, the Court finds that these allegations serve to satisfy the particularity requirement of Rule 9(b).

Defendants next contend that Plaintiff has failed to assert the predicate acts of mail and wire fraud because the complaint does not sufficiently allege the use of the mail or interstate electronic communications. To establish the second element of mail fraud, i.e., that the defendants used the mails in furtherance of the scheme, Plaintiff alleges that

> [a]ll Defendants violated 18 U.S.C. § 1341 multiple times, having devised or intended to devise a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises as contained in the various loan documents including, without limitation, sales contracts, loan applications and HUD–1 Settlement Statements. For the purpose of executing such scheme or artifice or attempting to do so, *all or some of the Defendants used the U.S. mail or private or commercial interstate carriers* in the furtherance of the predatory lending scheme.

*Id.* ¶ 92 (emphasis added). Plaintiff specifically alleges that at the closing she was told that the loan documents would be couriered to the closing attorney. *Id.* ¶ 43. Equity Title received a courier fee of $40. *Id.* ¶ 65.

To establish the second element of wire fraud, i.e., that the defendants used an interstate electronic communication in furtherance of the alleged scheme, Plaintiff asserts that

> Defendant Equity Title, acting on behalf of the enterprise, prepared the fraudulent settlement statements and the fraudulent closing documents. Defendant Equity Title *used the in-*

*terstate telephone lines to transfer intentionally and fraudulently altered closing documents on behalf of all defendants* and the enterprise.

*Id.* ¶ 102 (emphasis added).

Defendants' argument is premised in part on the omissions in the complaint that Equity Title used the mail in furtherance of the alleged scheme, or that Winkel specifically used the mail, or an interstate electronic communication, in furtherance of the alleged scheme.

■ The second element of a claim for mail or wire fraud—the use of the mails or an interstate electronic communication to further the fraudulent scheme—does not require personal use. *United States v. Cantrell,* 278 F.3d 543, 546 (6th Cir.2001); *United States .v. Brown,* 147 F.3d .477, 488 (6th Cir.1998); *see also United States v. Oldfield,* 859 F.2d 392, 400 (6th Cir. 1988)("Mail fraud only requires that the defendant reasonably anticipate, or as a reasonable person foresee, the use of the mails.") (quoting *United States v. Davidson,* 760 F.2d 97, 99 (6th Cir.1985)); *Echols v. AUSA, et al.,* No. 01–2033, Order on Defs.' Mot. to Dismiss (hereinafter "August 29,. 2001 Order"), August 29, 2001 at 19 (W.D.Tenn.2001). A complaint alleging mail fraud or wire fraud must, however, at a minimum allege that a mailing or an interstate electronic communication occurred. *United States v. Srulowitz,* 785 F.2d 382, 386–87 (2d Cir.1986) (noting that because the fact of a mailing is an element of the crime, the government must prove beyond a reasonable doubt that a mailing occurred to convict a defendant for mail fraud). "[L]oose references to mailings and telephone calls in furtherance of a purported scheme to defraud will not ·do. Instead, the plaintiff must, within reason, describe the time, place, and content of the mail and wire communications, and it must identify the parties to these communications." *Jepson Inc. v. Makita Corp.,* 34 F.3d 1321, 1328 (7th Cir.1994) (internal quotations and citations omitted).

With regard to mail fraud, Plaintiff asserts that all or some of the defendants used the U.S. mail or private,.or commercial interstate carriers in the furtherance of the predatory lending scheme. Plaintiff further alleges that the scheme could not have succeeded absent· mailing the fraudulent loan information· among the various defendants. Comp. ¶ 95. More specifically, however, Plaintiff alleges that she was told at the closing that the closing documents would be couriered to the attorney, who was allegedly not in attendance. Moreover, the HUD–1 statement indicates that a courier fee of $40 was assessed to Plaintiff.

With regard to wire fraud, Plaintiff alleges that Equity Title, acting on behalf of the enterprise, prepared the fraudulent settlement statements and the fraudulent closing documents and used the interstate telephone lines to transfer intentionally and fraudulently altered closing documents on behalf of all defendants and the enterprise. Additionally, Plaintiff asserts that Worldwide used the interstate telephone lines to transfer the fraudulently altered loan application. *Id.* ¶ 100.

These allegations indicate that Defendants used mail and interstate electronic communications in furtherance of the alleged scheme to defraud. Moreover, as previously noted, personal use of the mail or interstate electronic communication is not required to state a claim for mail or wire fraud. As such, Defendants' argument that the complaint does not allege that they individually used the mail or electronic communication is unavailing. Moreover, Plaintiff's "failure to indicate the exact date of each of these communications does not mandate dismissal of their mail and wire fraud claims because this information. likely would be in the exclu-

sive possession of [D]efendants." *Echols,* No. 01–2033, August 29, 2001 Order at 20. The Court finds that the complaint contains sufficient allegations to satisfy the requirement that the mail and interstate electronic communications were used to further the alleged scheme to defraud. Accordingly, the Court finds that Plaintiff sufficiently alleged the predicate offenses of mail fraud and wire fraud.

### 2. *Existence of an Enterprise*

Defendants next argue that Plaintiff's RICO claims should be dismissed because Plaintiff failed to establish the existence of an enterprise. Specifically, Defendant contends that Plaintiff has failed to establish any of the elements of an "association-in-fact enterprise." Defendant asserts that Plaintiff does not allege 1) how Equity Title or Winkel formed a formal or informal organization with the defendants, 2) that Equity Title and Winkel had an ongoing organization in which they continually and consistently provided fraudulent statements, 3) that the enterprise was separate from the pattern of racketeering activity, and 4) the existence of a pattern of racketeering activity.

An enterprise is a "group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). Title 18, section 1961(4) of the United States Code further provides that an enterprise is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals *associated in fact* although not a legal entity." 18 U.S.C. § 1961(4) (emphasis added). Plaintiffs may establish the existence of an enterprise therefore by showing an "association-in-fact enterprise." To establish an association-in-fact enterprise, the plaintiff must demonstrate "1) that the associated persons formed an on-going organization, formal or informal; 2) that they functioned as a continuing unit; and 3) that the organization was separate from the pattern of racketeering activity in which it engaged." *VanDenBroeck,* 210 F.3d at 699.

To satisfy the second element of an association-in-fact enterprise, the "complaint must contain facts suggesting that the behavior of the listed entities is 'coordinated' in such a way that they function as a 'continuing unit'...." *Begala v. PNC Bank, Ohio, Nat. Ass'n,* 214 F.3d 776, 781–82 (6th Cir.2000). To establish the third element, a plaintiff must show that the alleged enterprise has "a certain amount of organizational structure" or "some sort of 'chain of command' or other evidence of a hierarchy, even a highly limited one" enabling it to exist apart from the alleged pattern of wrongdoing. *Id.* at 699–700; *see also United States v. Rogers,* 89 F.3d 1326, 1337 (7th Cir.1996) (noting that "[a] RICO enterprise is an ongoing structure of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making") (internal quotations and citations omitted); *Echols,* No. 01–2033, August 29, 2001 Order at 22. However, "simply conspiring to commit a fraud is not enough to trigger the [RICO] Act if the parties are not organized in a fashion that would enable them to function as a racketeering organization for other purposes." *VanDenBroeck,* 210 F.3d at 699; *see also Richmond v. Nationwide Cassel, L.P.,* 52 F.3d 640, 645 (7th Cir. 1995) (emphasizing that "[a]n enterprise must be more than a group of people who get together to commit a 'pattern of racketeering activity,' and more than a group of associated businesses that are operated in concert under the control of one family") (internal quotations and citations omitted). Instead, an enterprise must have "a struc-

ture and goals separate from the predicate activities. themselves." *Richmond*, 52 F.3d at 645 (quoting *United States v. Korando*, 29 F.3d 1114, 1117 (7th Cir.1994)).

■ In addition, to establish the third element, the plaintiff must establish a pattern of racketeering, which is defined as at least two acts of racketeering activity occurring within ten years of each other. 18 U.S.C. § 1961(5); *see also Vild v. Visconsi*, 956 F.2d 560, 565 (6th Cir.1992). A pattern of racketeering activity is established by showing 1) a relationship between predicate acts, and 2) the threat of continuity. *See H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 238, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). Predicate acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated events." *H.J., Inc.*, 492 U.S. at 240, 109 S.Ct. 2893 (internal quotations and citation omitted). To establish continuity, "plaintiffs can either demonstrate a 'closed-ended' or an 'open-ended' pattern; the former consists of 'a closed period of repeated conduct,' whereas the latter refers to 'past conduct that by its nature projects into the future with the threat of repetition.'" *Echols*, No. 01–2033, August 29, 2001 Order at 25 (citing *H.J., Inc.*, 492 U.S. at 241, 109 S.Ct. 2893.). Courts must focus on the predicate racketeering activities, not the events preceding or following those predicate acts. *Vemco v. Camardella*, 23 F.3d 129, 134 (6th Cir. 1994) (refusing to consider events that did not qualify as predicate acts and determining that the predicate acts spanned only seventeen months, a time frame insufficient to show the continuity required for a pattern). In cases involving mail or wire fraud, however, the court should look beyond the actual mailings or transmissions, and examine the scope of the fraudulent schemes which the mailings or transmissions furthered. *Echols*, No. 01–2033, August 29, 2001 Order at 26–27 (citing *Tabas v. Tabas*, 47 F.3d 1280, 1294 (3d Cir.1995) (noting that "[a]lthough the mailing is the actual criminal act, the instances of deceit constituting the underlying fraudulent scheme are more relevant to the continuity analysis")).

■ In the instant case, Plaintiff alleges generally that

> [f]rom on or about 2001 through 2004, all Defendants, all of which are persons within the meaning of RICO, were employed by or associated with an enterprise whose activities engaged in or affected interstate commerce and conducted or participated, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c); to wit multiple violations of [mail and wire fraud.] The members of the group have the same or similar purposes, results, participants, victims, methods of commission and are interrelated by distinguishing characteristics. These are not isolated events, but represent a pattern of discriminatory and predatory practices.

> . . . . .

> The associated persons formed an ongoing organization, formal or informal, concerning the RICO enterprise, and the various associates functioned as a continuing unit of the RICO Enterprise, and the RICO enterprise exists separate and apart from the predicate activities themselves. The facts in the case demonstrate the existence of an association-in-fact RICO enterprise by showing that the enterprise has a certain amount of organizational structure or some sort of chain of command.

Comp. ¶¶ 91, 97. Plaintiff argues that the facts alleged in the complaint "support the existence of an organizational structure encompassing phases from victim recruitment, qualifying for a loan, brokering the loan and closing the loan, to eventual loan assignment." Pls.' Resp. Opp. Mot. to Dismiss at 12. The Court agrees and finds that Plaintiffs' complaint at least allows an inference that the alleged enterprise has a sufficient structure to enable it to function independently of its predicate acts.

The organizational structure, the coordination of the continuing unit, and pattern of racketeering activity of the association-in-fact enterprise as alleged *inter alia* is summarized as follows. First, Worldwide/MFS/HomeTech induces individuals into signing up for a mortgage by fraudulent misrepresentations and omissions. Compl. ¶ 98. Once the individuals decide to consolidate their debt or have home repairs made, Worldwide directs the borrowers through the financing process. *Id.* EA works in tandem with Worldwide to induce borrowers to enter into contracts whereby the borrowers are not informed of the benefits EA will receive or the obligations that will be imposed on them. *Id.* ¶ 101. On behalf of all the defendants, Worldwide then distributes the fraudulent loan applications and forged or fraudulently manufactured income or asset verifications through interstate telephone lines. *Id.* ¶ 100. Equity Title and Winkel, a principal and part-owner of Equity Title, prepare the fraudulent settlement statements and fraudulent closing documents. *Id.* ¶¶ 11, 47, 102. All or some of the defendants then use the U.S. mail or private or commercial interstate carriers to send the documents. *Id.* ¶¶ 43, 65, 92. These factual allegations are not isolated events, but represent a pattern of discriminatory and predatory practices by the defendants to ensnare unsophisticated African Americans, which has been ongoing from 2001 through 2004, as evidenced by the defen-

dants' and Equity Title and/or Winkel's alleged actions and commission of predicate offenses in the instant case and in *Johnson v. Home Tech Serv. Co., Inc., et al.,* No. 03–2567 -Ma/P and *Carr v. Home Tech Serv. Co., Inc., et al.,* No. 03–2569–Ma/P, which are currently pending in the Western District of Tennessee. *Id.* ¶¶ 89, 91.

The Court finds that these allegations are sufficient to establish an inference that Equity Title and Winkel were part of an ongoing informal organization. Likewise, these allegations are sufficient to establish that the behavior of Equity Title and Winkel was coordinated in such a way that they functioned with at least some of the other defendants as a continuing unit.

Finally, these allegations sufficiently establish that Equity Title and Winkel engaged in a pattern of racketeering activity. Despite the fact that this case involves one loan transaction and *Johnson* and *Carr* involve different loan transactions, the overlapping actors in Plaintiff's transaction, as well as the parallels in the ways that some of the defendants, including Equity Title and Winkel, allegedly deceived all of the plaintiffs in these cases provide unity to the loan transactions. Plaintiff alleges activities with the same or similar purposes and results, many of the same participants, and nearly identical methods of commission. When viewed in a light most favorable to Plaintiff, the complaint alleges activities that are "interrelated by distinguishing characteristics and are not isolated events." *H.J., Inc.,* 492 U.S. at 240, 109 S.Ct. 2893; *see also Vild,* 956 F.2d at 566 (noting that the relationship test is not a cumbersome requirement for RICO plaintiffs).

Furthermore, the Court finds that Plaintiff has established continuity sufficient to withstand a motion to dismiss. Plaintiff's complaint alleges a scheme and racketeer-

ing activity spanning and occurring from 2001 through 2004, including predicate acts occurring in the instant case from approximately December 2002 through March 2003 and in *Johnson* and *Carr* from approximately January 2002 through July or August 2002. Thus, the relevant time span is roughly fourteen months.

In *Echols*, the court reasoned that

[a]lthough a period of fourteen months without more would be insufficient to demonstrate a closed-ended continuity, *see Vemco*, 23 F.3d at 134 (holding that plaintiff failed to satisfy continuity requirement where he alleged a single fraudulent scheme that lasted seventeen months and involved the construction of a single building contract), plaintiffs allege additional factors not present in *Vemco*. Specifically, the alleged enterprise engaged in a pattern of racketeering activity that targeted three distinct victims and involved three separate real estate transactions. The existence of multiple schemes and victims is relevant to the determination of whether a pattern of racketeering activity exists. *Id.*

*Echols*, August 29, 2001 Order at 27–28. The *Echols* Court went on to note that "most cases involving closed-ended continuity involve predicate acts spanning several years." *Id.* at 28 (citing *United States v. Pelullo*, 964 F.2d 193, 209 (3d Cir.1992); *Metromedia v. Fugazy*, 983 F.2d 350, 369 (2d Cir.1992) (holding that a two year time span was sufficient to allege pattern); *Hindes v. Castle*, 937 F.2d 868, 875 (3d Cir.1991) (collecting cases where racketeering activities ranged from four-and-a-half years to seventeen years); *Jacobson v. Cooper*, 882 F.2d 717, 720 (2d Cir.1989) (concluding that predicate acts occurring over an eight year time span satisfied continuity requirement)). The *Echols* Court further noted that "the dividing line between conduct occurring just over a year and activities occurring over a number of years is somewhat indefinite." *Id.* The court concluded, however, that "defendants' alleged actions over approximately fourteen months involving multiple schemes and targeting multiple victims satisfy the closed-ended continuity requirement." *Id.* This Court agrees with the reasoning and holding of the *Echols* Court concerning the issue of continuity. Given the alleged actions of Equity Title and Winkel, as well as that of other defendants, the Court concludes that the complaint sufficiently alleges continuity. Plaintiff therefore has alleged a pattern of racketeering activity. The Court finds therefore that Plaintiff has alleged an "association-in-fact enterprise." Accordingly, Defendants' motion to dismiss on this basis is denied.

Defendants additionally argue that Plaintiff has not adequately alleged their involvement in the association-in-fact enterprise. More specifically, Equity Title and Winkel contend that Plaintiff's complaint fails to state a RICO claim under 18 U.S.C. § 1962(c) because the complaint contains no indication of how they "conducted" or "participated" in the affairs of the enterprise.

In *Reves v. Ernst & Young*, 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), the Court addressed the issue of the degree of participation required in a RICO enterprise. The Court held that "in order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs." *Id.* at 179, 113 S.Ct. 1163 (quoting 18 U.S.C. § 1962(c)). Specifically, "one must participate in the operation or management of the enterprise itself." *Id.* at 185, 113 S.Ct. 1163. RICO liability, however, is not limited to those with primary responsibility for the enterprise's affairs. *Id.* at 184, 113 S.Ct. 1163. Indeed,

[a]n enterprise is "operated" not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management. An enterprise also might be "operated" or "managed" by others "associated with" the enterprise who exert control over it as, for example, by bribery.

*Id.* The *Reves* Court concluded that the defendant, an accounting firm which had audited an allegedly fraudulent enterprise and had issued incorrect financial statements based on information provided by the enterprise, had not "participated" sufficiently in the enterprise's affairs to be liable under § 1962(c). *Id.* at 186, 113 S.Ct. 1163.

In *Echols,* the court noted that several courts, when applying *Reves,* have "distinguished between cases involving outsiders, such as the accounting firm in *Reves,* who allegedly participate in an enterprise's affairs by providing advice or services, and cases involving 'association-in-fact' enterprises, where the individuals or entities providing the services constitute the RICO enterprise." *Echols,* No. 01–2033, August 29, 2001 Order at 30 (citing *Goren v. New Vision Int'l, Inc.,* 156 F.3d 721, 728 n. 3 (7th Cir.1998) (emphasizing that the alleged enterprise was not an association-in-fact and that particular defendants were not alleged to be part of the enterprise but were "best characterized as contractors hired by the enterprise to perform specific tasks"); *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.,* 62 F.3d 967, 978–79 (7th Cir.1995) (holding that defendants were " 'lower rung participants who are under the direction of upper management' " and noting that "[t]he primary fact leading us to this conclusion is the nature of the 'enterprise' [plaintiff] has depicted, as both [defendants] are alleged to be members of an 'association-in-fact' constituting the RICO enterprise") (quoting *Reves,* 507 U.S. at 184, 113 S.Ct. 1163);

*United States v. Oreto,* 37 F.3d 739, 750 (1st Cir.1994)))). The *Echols* Court elaborated on this distinction, stating that

*Reves* is a case about the liability of outsiders who may assist the enterprise's affairs. Special care is required in translating *Reves'* concern with "horizontal" connections—focusing on the liability of an outside adviser—into the "vertical" question of how far RICO liability may extend within the enterprise but down the organizational ladder. In our view, the reason the accountants were not liable in *Reves* is that, while they were undeniably involved in the enterprise's decisions, they neither made those decisions nor carried them out; in other words, the accountants were outside the chain of command through which the enterprise's affairs were conducted.

*Id.* at 31 (quoting *Oreto,* 37 F.3d at 750).

The *Echols* Court then considered the facts in that case as compared to those in *Reves.* *Id.* The allegations in *Echols,* similar to the allegations in the instant action, alleged an association-in-fact enterprise, wherein certain defendants, "acting on behalf of the enterprise of which they were members, committed acts of fraud when they prepared the closing documents and settlement statements." *Id.* The *Echols* Court determined that the defendants' "alleged actions [were] not analogous to outsiders who perform services, albeit with knowledge of illegality, for an enterprise of which they are not members." *Id.* at 31–32. The court concluded that the plaintiff provided sufficient factual allegations from which it could "infer that some of the defendants conducted or participated, either directly or indirectly, in the enterprise's activities." *Id.* at 32.

The Court finds that the holding in *Echols* is applicable to the instant case. Plaintiff alleged an association-in-fact en-

terprise of which Equity Title and Winkel were members. Like the facts in *Echols,* in the instant case, Equity Title and Winkel, allegedly working on behalf of the enterprise, committed acts of fraud when they prepared the closing documents and settlement statements. The facts alleged in this case are not analogous to those in *Reves* whereby outsiders performed services, albeit with knowledge of illegality, for an enterprise of which they were not members. The Court finds therefore that the complaint provides sufficient allegations from which to infer that Winkel and Equity Title conducted or participated in the enterprise's activities.

In sum, the Court finds that the complaint contains sufficient allegations to establish that 1) the defendants committed two or more predicate offenses; 2) an enterprise existed; 3) a connection existed between the pattern of racketeering activity and the enterprise; and 4) the plaintiff suffered an injury to business or property as a result. Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's § 1962(c) claim.

Defendants next assert that Plaintiff has not established a violation of 18 U.S.C. § 1962(d). In support of this contention, Defendants rely on Plaintiff's alleged failure to state a claim pursuant 18 U.S.C. § 1962(c). The Court has determined, however, that the complaint sufficiently alleges a claim for violation of 18 U.S.C. § 1962(c). Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's claim for violation of 18 U.S.C. § 1962(d).

### B. *FHA Claims*

Defendants assert that Plaintiff has failed to state a claim against them pursuant to the FHA. Plaintiff asserts claims against Defendants for violations of 42 U.S.C. §§ 3604(b) and 3605. The complaint alleges that

all Defendants were involved in a scheme that intentionally targets African Americans and African American neighborhoods with fraudulent loan practices that are designed to take away their homes.

* * * * *

Specifically, all Defendants have violated the Fair Housing Act by making housing available to African–Americans and subjecting them to discriminatory terms and conditions thereby reducing their ability to use and enjoy housing. Defendants have carried out their discriminatory scheme through a series of predatory practices designed to deprive African Americans of the use, enjoyment, and ultimately ownership of their homes.

Compl. ¶¶ 126, 127.

■■■ Title 42, section 3604 of the United State Code provides in pertinent part that it shall be unlawful:

(b) To discriminate against any person in the terms, conditions, or privileges of *sale or rental of a dwelling, or in the provision of services or facilities in connection therewith,* because of race, color, religion, sex, familial status, or national origin.

42 U.S.C. § 3604(b) (emphasis added). Courts have recognized that § 3604(b) of the United States Code prohibits "discrimination in the terms or conditions under which housing is sold or leased." *Maki v. Laakko,* 88 F.3d 361, 365 (6th Cir.1996). "Congress intended § 3604 to reach a broad range of activities that have the effect of denying housing opportunities to a member of a protected class." *Michigan Protection and Advocacy Serv., Inc. v. Babin,* 18 F.3d 337, 344 (6th Cir.1994). Moreover, the phrase "or in the provision of services or facilities" has been broadly construed by courts. *See, e.g., Campbell v.*

*City of Berwyn,* 815 F.Supp. 1138, 1143–44 (N.D.Ill.1993); *see also Dunn v. Midwestern Indem., Mid–American Fire and Cas.,* 472 F.Supp. 1106, 1110 (D.C.Ohio 1979) (noting that the phrase "or in the provision of services or facilities" has been broadly construed to encompass municipal services such as sewage treatment). Thus, the language of § 3604(b) is broad enough to encompass home improvement loans and refinancing loans because the burden of the debt affects individuals ability to buy or sell a dwelling.

In the instant case, Plaintiff refinanced the existing mortgage on her home. Moreover, Equity Title and Winkel are alleged to have provided services in connection with the refinancing of Plaintiff's existing mortgage. The Court finds, therefore, that Plaintiff has asserted a claim against Defendants for violation of § 3604(b). Accordingly, the Court denies Equity Title and Winkel's motion to dismiss Plaintiff's claim pursuant to 42 U.S.C. § 3604(b).

■■■ Defendants further assert that Plaintiff's claim for violation of 42 U.S.C. § 3605 should be dismissed. Title 42, section 3605 of the United States Code provides *inter alia* that

> [i]t shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin.
>
> (b) "Residential real estate-related transaction" defined
>
> As used in this section, the term "residential real estate-related transaction" means any of the following:
>
> (1) The making or purchasing of loans or providing other financial assistance—

> (A) for purchasing, constructing, improving, repairing, or maintaining a dwelling; or
>
> (B) secured by residential real estate.
>
> (2) The selling, brokering, or appraising of residential real property.

42 U.S.C. § 3605. Thus, in order to be liable under § 3605, the entity or person making the loan must be engaged in the business of residential real estate transactions. The business of residential real estate transactions includes 1) making loans, 2) purchasing loans, 3) providing financial assistance, 4) selling residential real property, 5) brokering residential real property, or 6) appraising residential real property.

■■■ Plaintiff alleges that Defendants acted as the settlement agent for the loan transaction. Plaintiff does not allege, however, that either Winkel or Equity Title engaged in the business of residential real estate transactions as defined by § 3605. Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's claim against Equity Title and Winkel for violation of 42 U.S.C. § 3605.

### C. *ECOA and TILA Claims*

Equity Title and Winkel argue that Plaintiff's claims against them for violation of 15 U.S.C. § 1691, *et seq.,* of ECOA, and 15 U.S.C. § 1601, *et seq.,* of TILA should be dismissed. Section 1691 of the ECOA provides in pertinent part that

> [i]t shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction—
>
> (1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract);

(2) because all or part of the applicant's income derives from any public assistance program; or

(3) because the applicant has in good faith exercised any right under this chapter.

15 U.S.C. § 1691(a). The term "creditor" is defined as "any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of the original creditor who participates in the decision to extend, renew, or continue credit." 15 U.S.C. § 1691a (e). Regulation B of the ECOA further provides that

Creditor means a person who, in the ordinary course of business, regularly participates in a credit decision, including setting the terms of the credit. The term creditor includes a creditor's assignee, transferee, or subrogee who so participates. For purposes of § 202.4(a) and (b), the term creditor also includes a person who, in the ordinary course of business, regularly refers applicants or prospective applicants to creditors, or selects or offers to select creditors to whom requests for credit may be made. A person is not a creditor regarding any violation of the Act or this regulation committed by another creditor unless the person knew or had reasonable notice of the act, policy, or practice that constituted the violation before becoming involved in the credit transaction. The term does not include a person whose only participation in a credit transaction involves honoring a credit card.

12 C.F.R. § 202.2(*l*).

■ The complaint alleges that Equity Title and Winkel, as principal and part owner of Equity Title, acted as the settlement agent for the loan at issue. Plaintiff does not allege that either Equity Title or Winkel was the lender or that they regularly participate in credit decisions in the ordinary course of business. Likewise, the complaint does not assert that Equity Title is "an entity granting members the ability 'to defer payment of a debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor....'" *Mays v. Buckeye Rural Elec. Co-op., Inc.*, 277 F.3d 873, 873 (6th Cir.2002) (citing 15 U.S.C. § 1691a(d) and holding that defendant was a creditor under the ECOA based on the definition of credit found in 15 U.S.C. § 1691a(d)). The Court finds that Plaintiff has failed to establish that either Equity Title or Winkel are creditors pursuant to the ECOA. Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's claim against them for violation of 15 U.S.C. § 1691, *et seq.*, without legal prejudice.

Defendants likewise assert that they are not creditors under TILA. The purpose of TILA is

to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices.

15 U.S.C. § 1601(a). Title 15, section 1640 of the United States Code therefore establishes civil liability when a "creditor" fails to comply with any requirement imposed under TILA. 15 U.S.C. § 1640(a). The term creditor is defined in pertinent part as

a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt

arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement.

15 U.S.C. § 1602(f).

As discussed *supra*, Plaintiff alleges that Equity Title and Winkel, as principal and part owner of Equity Title, acted as the settlement agent for the loan at issue. Plaintiff does not allege that Defendants extended consumer credit or that they regularly do so. The Court finds therefore that Plaintiff had failed to allege that Equity Title and Winkel are creditors pursuant to TILA. Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's claim for violation of 15 U.S.C. § 1601, *et seq.*, without legal prejudice.

### D. *RESPA Claims*

██ Defendants contend that Plaintiff's claims raised pursuant to 12 U.S.C. §§ 2604(c) and 2607 of RESPA should be dismissed because 1) § 2604(c) does not provide a private damages remedy, and 2) Plaintiff did not allege that the excessive or unearned fees were kicked back or split with a third party. Title 12, section 2604(c) of the United States Code provides that "[e]ach lender shall include . . . a good faith estimate of the amount or range of charges for specific settlement services the borrower is likely to incur in connection with the settlement as prescribed by the Secretary." 12 U.S.C. § 2604(c).

The Court of Appeals for the Eleventh Circuit has held that no implied private right of action exists for violations of § 2604(c). *Collins v. FMHA–USDA,* 105 F.3d 1366, 1367–68 (11th Cir.1997). In so ruling, the *Collins* Court reasoned that § 2604(c) replaced the prior § 2605, which explicitly provided for an action for damages for its violations, and that other provisions of RESPA explicitly provide civil remedies. *Id.* at 1368. The court concluded that "there is no private civil action for a violation of 12 U.S.C. § 2604(c), or any regulations relating to it" because no evidence exists to establish that Congress intended to create a private right of action, which is one of the prerequisites to finding an implied right of action under *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). *Id.* at 1368. Plaintiff does not argue that the holding in *Collins* is incorrect. Moreover, the Court finds that the reasoning in *Collins* is persuasive and, as such, holds that no private right of action exists for violations of § 2604(c). Accordingly, Defendants' motions to dismiss Plaintiff's claim for violation of 12 U.S.C. § 2604(c) is granted.

Defendants next assert that Plaintiff's claim for violation of 12 U.S.C. § 2607(b) should be dismissed. Section 2607(b) provides that "[n]o person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed." 12 U.S.C. § 2607(b). Defendants assert that the complaint fails to allege that Equity Title or Winkel "kicked back" or split excessive or unearned fees with a third party. In response to the motion to dismiss, Plaintiff asserts that "Equity Title split the fee for document preparation with Online in spite of the fact that, upon information and belief, Online performed the service." Pl.'s Resp. Opp. Mot. to Dismiss at 26. Although the complaint alleges that Online received a document preparation fee of $45.00, it does not indicate that Equity Title or Winkel split or paid the fee to Online. The Court of Appeals for the Sixth Circuit has accepted the proposition that when "a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district

court dismisses the action with prejudice." *EEOC v. Ohio Edison Co.*, 7 F.3d 541, 546 (6th Cir.1993) (quoting *Bank v. Pitt*, 928 F.2d 1108, 1112 (11th Cir.1991)). Likewise, a party may seek leave to amend the complaint, and "leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). Plaintiff asked for leave to amend the complaint should the Court determine that it is necessary. The Court therefore grants Plaintiff fifteen days to amend the complaint. Accordingly, Defendants' motion to dismiss Plaintiff's claim for violation of 12 U.S.C. § 2607(b) is conditionally denied.

### E. *Fraud*

█ Defendants assert that Plaintiff's state law claim for fraud should be dismissed because she failed to plead the claim with particularity in accordance with Fed.R.Civ.P. 9(b). Under Tennessee law, to establish a claim for fraud, the plaintiff must show:

> (1) an intentional misrepresentation with regard to a material fact, (2) knowledge of the representation['s] falsity— that the representation was made "knowingly" or "without belief in its truth," or "recklessly" without regard to its truth or falsity, (3) that the plaintiff reasonably relied on the misrepresentation and suffered damage, and (4) that the misrepresentation relates to an existing or past fact, or, if the claim is based on promissory fraud, then the misrepresentation must "embody a promise of future action without the present intention to carry out the promise."

*Shahrdar v. Global Housing, Inc.*, 983 S.W.2d 230, 237 (Tenn.Ct.App.1998) (quoting *Stacks v. Saunders*, 812 S.W.2d 587, 592 (Tenn.Ct.App.1990)). As discussed *supra* in section A.1., Rule 9(b) requires a plaintiff to plead fraud with particularity. Fed.R.Civ.P. 9(b). The particularity requirement has been interpreted to mean that a plaintiff must allege at a minimum "the time, place, and content of the alleged misrepresentation ...; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Coffey*, 2 F.3d at 162. Moreover, "allegations of fraudulent misrepresentation must be made with sufficient particularity and with a sufficient factual basis to support an inference that they were knowingly made." *Advocacy Org.*, 176 F.3d at 322 (quoting *Coffey*, 2 F.3d at 162).

In ruling upon a motion to dismiss pursuant to Fed.R.Civ.P. 9(b), a court must consider the policy of simplicity in pleading embodied in Fed.R.Civ.P. 8. *Michaels Bldg. Co.*, 848 F.2d at 679. Rule 8 requires the plaintiff to provide a "short and plain statement of the claim" and "simple, concise, and direct" allegations. Fed. R.Civ.P. 8. The principal purpose for the Fed.R.Civ.P. 9(b) particularity requirement, when considered in context with Fed.R.Civ.P. 8, is to ensure that the defendant receives fair notice of the alleged misconduct or fraudulent acts of which the plaintiff complains in order to prepare a responsive pleading. *Michaels Bldg. Co.*, 848 F.2d at 679. Moreover, an exception to the particularity requirement of Fed. R.Civ.P. 9(b) exists when the relevant facts "lie exclusively within the knowledge and control of the opposing party." *Wilkins ex rel. United States v. State of Ohio*, 885 F.Supp. 1055, 1061 (S.D.Ohio 1995). In such a case, pleading upon information and belief is permissible. The plaintiff, however, must still plead a statement of facts upon which the belief is based. *Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 489 (6th Cir.1990). A court should hesitate to dismiss an action when the facts underlying the claim are within the defendant's control, especially when no discovery has been conducted. *Michaels Bldg. Co.*, 848 F.2d at 680.

As discussed in section A.1., the complaint asserts in effect that these Defendants prepared a fraudulent settlement statement and other documents; and, as a result, Plaintiff was not advised or aware of various fees and costs associated with the mortgage loan. Moreover, the complaint alleges that Defendants had knowledge that the documents and other representations were false, as evidenced by Winkel's notarization of the Deed of Trust despite his alleged absence from the meeting when Plaintiff signed the document. Finally, Plaintiff alleges that she relied on the documents prepared by Defendants, which resulted in her entering into a mortgage agreement that was to her detriment in that it deprived her of money or property. The Court finds that these allegations are sufficient to satisfy Fed.R.Civ.P. 9(b) in light of Fed.R.Civ.P. 8. Moreover, the Court finds that Plaintiff has alleged a claim for fraud pursuant to Tennessee law. Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's claim for fraud.

### F. *Conversion*

Defendants next assert that the complaint fails to state a claim for conversion. To establish a claim for conversion under Tennessee law, a plaintiff must show that the defendant has "1) appropriated something belonging to the plaintiff to its own use and benefit, 2) by the exercise of dominion over it, 3) in defiance of the plaintiff's right." *Mammoth Cave Credit Ass'n v. Oldham*, 569 S.W.2d 833, 836 (Tenn.Ct.App.1977) (internal quotations and citations omitted). The complaint alleges that "each Defendant unlawfully took and/or converted to his/her/its own use certain property of the Plaintiff, to wit: loan proceeds on the subject properties." Compl. ¶ 143. Moreover, the complaint alleges in effect that Equity Title and Winkel appropriated, by taking undisclosed, unreported or unreasonable fees, and/or loan proceeds belonging to Plaintiff for their own use. Given the liberal pleading standards under Rule 8 and the standards under Rule 12(b)(6), the Court finds that the complaint presents sufficient allegations to withstand these Defendants' motion to dismiss Plaintiff's claim for conversion against them.

### G. *Negligent Misrepresentation*

Defendants contend that Plaintiff's claim for negligent misrepresentation should be dismissed because Plaintiff failed to identify any representations made by them, upon which she relied. Tennessee has adopted the definition of negligent misrepresentation that appears in section 552 of the Restatement (Second) of Torts. *Robinson v. Omer*, 952 S.W.2d 423, 427 (Tenn.1997). Pursuant to this definition, even when there is no contractual privity between the plaintiff and the defendant, the plaintiff can recover by establishing that:

(1) the defendant is acting in the course of his business, profession, or employment, or in a transaction in which he has a pecuniary (as opposed to gratuitous) interest; and

(2) the defendant supplies faulty information meant to guide others in their business transactions; and

(3) the defendant fails to exercise reasonable care in obtaining or communicating the information; and

(4) the plaintiff justifiably relies upon the information.

*Id.* (internal quotations omitted) (emphasis omitted). Plaintiff's complaint alleges that "all Defendants had a duty of due care to the Plaintiff and that the Defendants breached such duty to Plaintiff by omitting or misrepresenting material information to Plaintiff; the negligent misrepresentation of Defendants was the proximate cause of damages suffered by Plaintiffs." Compl.

¶ 144. Defendants argue that Plaintiff failed to identify any representations made by them upon which she justifiably relied. As discussed previously, however, the complaint alleges that, to obtain the mortgage loan, Plaintiff relied on the fraudulent settlement statement and other documents prepared by Equity Title and Winkel, as principal and part owner of Equity Title. The complaint further alleges in sum that these documents were replete with omissions and/or misrepresentations. The Court finds that the allegations in the complaint are sufficient to state a claim for negligent misrepresentation against these Defendants. Accordingly, the Court denies Equity Title and Winkel's motion to dismiss Plaintiff's claim for negligent misrepresentation.

### H. *Breach of Fiduciary Duty*

■ Defendants assert that Plaintiff has not alleged facts supporting her assertion that a fiduciary relationship existed between herself and Equity Title or Winkel. The complaint alleges that "[a]ll Defendants were agents of the Plaintiff during the relevant period ... [and] as agents of the Plaintiff, owed fiduciary duties to [her]." Compl. ¶¶ 119, 120. More specifically, Plaintiff alleges that "[a]s agents, Defendants had a fiduciary duty to disclose all material facts relevant to the subject matter of the loan." *Id.* ¶ 121. In Tennessee,

> [a]n agent is a fiduciary with respect to the matters within the scope of his agency. The very relationship implies that the principal has reposed some trust or confidence in the agent and the agent or employee is bound to the exercise of the utmost good faith, loyalty, and honesty toward his principal or employer.

*Knox–Tenn Rental Co. v. Jenkins Ins., Inc.,* 755 S.W.2d 33, 36 (Tenn.1988) (citing 3 Am.Jur.2d Agency, § 210, p. 713). Therefore, at a minimum, Plaintiff has alleged an agency relationship existed between herself and Equity Title and Winkel which created a fiduciary duty.

■ Moreover, Plaintiff alleges that Equity Title served as the closing agent for the loan transaction and that the loan disbursement statement shows that Equity Title was paid attorney fees. "The relationship of attorney and client is 'extremely delicate and fiduciary'; therefore, attorneys must deal with their clients in utmost good faith." *Alexander v. Inman,* 974 S.W.2d 689, 693–94 (Tenn.1998)(internal quotations and citations omitted). The Court finds that the complaint alleges sufficient facts to infer the existence of a fiduciary relationship between Equity Title and Plaintiff. Furthermore, Winkel may be vicariously liable for Equity Title's actions because Plaintiff alleges that Winkel is a principal and part owner of Equity Title. Accordingly, the Court denies Winkel and Equity Title's motion to dismiss Plaintiff's claim for breach of fiduciary duty.

### I. *Breach of Contract*

■ Defendants assert that Plaintiff has not alleged the existence of a contract between herself and Equity Title or Winkel. Plaintiff alleges that "all Defendants had contractual relationships with the Plaintiff, either directly or implicitly; Defendants, either directly or through agents, breached such contracts with Plaintiffs; and that the breaching of such contracts by Defendants was the proximate cause of damages suffered by Plaintiff." Compl. ¶ 145. Under Tennessee law, a plaintiff alleging breach of contract must plead sufficient facts to establish "(1) the existence of a contract, (2) breach of the contract, and (3) damages which flow from the breach." *Life Care Centers v. Charles Town Assoc.,* 79 F.3d 496, 514 (6th Cir. 1996). Despite Plaintiff's allegation, the Court cannot identify the existence of any

contract between Equity Title or Winkel and Plaintiff. Likewise, the complaint does not indicate how Equity Title or Winkel breached any existing contract. For these reasons, the Court grants Equity Title's and Winkel's motion to dismiss Plaintiff's claim for breach of contract, without legal prejudice.

### J. *TCPA Claim*

■ Defendants maintain that the Court should dismiss Plaintiff's claim against them for violation of the Tennessee Consumer Protection Act. The TCPA provides for a private cause of action as follows:

Any person who suffers an ascertainable loss of money or property, real, personal, or mixed, . . . as a result of the use or employment by another person of an unfair or deceptive act or practice declared to be unlawful by this part, may bring an action individually to recover actual damages.

Tenn.Code Ann. § 47–18–109(a). Courts are required to construe the provisions of the TCPA liberally in order "to protect consumers and legitimate business enterprises from those who engage in 'unfair or deceptive acts or practices in the conduct of any trade or commerce.'" *Pursell v. First American Nat'l Bank*, 937 S.W.2d 838, 841 (Tenn.1996) (quoting Tenn.Code Ann. § 47–18–102(2)); *see also Ganzevoort v. Russell*, 949 S.W.2d 293, 296–97 (Tenn. 1997); *Morris v. Mack's Used Cars*, 824 S.W.2d 538 (Tenn.1992). To assert a claim pursuant to the TCPA, the plaintiff must establish that the defendant engaged in tortious conduct and that the plaintiff was exposed/subject to the tortious conduct. *See Harvey v. Ford Motor Credit Co.*, 8 S.W.3d 273, 276 (Tenn.Ct.App.1999).

■ Defendants argue that Plaintiff fails to allege any tortious acts committed by Equity Title or Winkel or that Plaintiff was exposed to that tortious act. Plaintiff alleges that "all Defendants have engaged in fraudulent and/or deceptive business transactions towards Plaintiff and have thereby violated the provisions of the [TCPA] resulting in damages to the plaintiff." Compl. ¶ 140. Moreover, as discussed *supra*, the Court has determined that Plaintiff has sufficiently pled claims for fraud, negligent misrepresentation, and breach of fiduciary duty against Equity Title and Winkel. The Court finds therefore that Plaintiff has sufficiently pled a claim against Defendants for violation of the TCPA. Accordingly, the Court denies Equity Title and Winkel's motion to dismiss Plaintiff's TCPA claim.

### K. *Unconscionability*

■ Defendants assert that Plaintiff's claim for "unconscionability" should be dismissed. Plaintiff asserts that the Court may act to refuse to enforce contracts or limit application of any unconscionable clause in any contracts pursuant to Tenn. Code Ann. § 47–2–302. Section 47–2–302 provides:

(1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

(2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination.

Tenn.Code Ann. § 47–2–304.

The Court previously determined that Plaintiff failed to establish a claim for

breach of contract against Equity Title or Winkel. Plaintiff therefore cannot assert a claim against, or seek relief from, Equity Title or Winkel pursuant to Tenn.Code Ann. § 47–2–302. Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's claim against them for "unconscionability," without legal prejudice.

## L. *Conspiracy*

Defendants contend that Plaintiff's claim for conspiracy should be dismissed because Plaintiff does not allege that the primary purpose of Equity Title or Winkel was to injure Plaintiff or that Defendants engaged in an unlawful or tortious act. Defendants further assert that Plaintiff fails to allege a specific overt act in furtherance of conspiracy that is tortious or illegal.

In support of her conspiracy claim, Plaintiff alleges that all of the defendants "agreed by and between each other to engage in a scheme to obtain money from Plaintiff and others similarly situated" and "acted in concert to obtain money from Plaintiff and others ... by engaging in a series of fraudulent transactions." Compl. ¶¶ 111, 112. Plaintiff further alleges that the defendants "intended to accomplish this common purpose and knew of each other's intent to accomplish this purpose." *Id.* ¶ 113. Finally, Plaintiff alleges that the defendants "engaged in one or more overt acts of mail fraud, wire fraud, and fraudulent lending." *Id.* ¶ 114. These allegations indicate that Plaintiff alleges a conspiracy to defraud.

 Tennessee courts have defined a civil conspiracy as "a combination between two or more persons to accomplish by concert an unlawful purpose, or to accomplish a purpose not in itself unlawful by unlawful means." *Dale v. Thomas H. Temple Co.,* 186 Tenn. 69, 208 S.W.2d 344, 353 (1948). Under Tennessee law, to prove a conspiracy to defraud, the plaintiff must establish:

a common purpose, supported by a concerted action to defraud, that each has the intent to do it, and that it is common to each of them, and that each has the understanding that the other has the purpose. The agreement need not be formal, the understanding may be a tacit one, and it is not essential that each conspirator have knowledge of the details of the conspiracy.

*Id.* (internal quotations and citations omitted). "Because the agreement does not need to be a formal one, plaintiffs can prove the existence of a conspiracy through circumstantial evidence, including inferences from the relationships among the parties." *Echols,* No. 01–2033, August 29, 2001 Order at 47 (citing *Dale,* 208 S.W.2d at 353). If the plaintiff succeeds in proving a conspiracy, "each conspirator is liable for all damages caused by the actions of any of his coconspirators in carrying out their common design." *Id.* (citing *Dale,* 208 S.W.2d at 354).

 Defendants argue that Plaintiff did not allege that Equity Title and Winkel committed an overt act in furtherance of the conspiracy. This argument fails to recognize, however, that because "each conspirator is responsible for everything done by his confederates which the execution of the common design makes probable as a consequence, ... each is liable for all damages naturally flowing from any wrongful act of a coconspirator in carrying out such common design." *Dale,* 208 S.W.2d at 354 (quotations omitted). Moreover, Plaintiff alleges in the complaint that Equity Title prepared the fraudulent closing documents and Winkel notarized at least one document despite his absence from the closing. This argument is therefore without merit.

Defendants also argue that Plaintiff's allegations only establish that Equity Title and Winkel were pursuing their own busi-

ness interests, i.e., to obtain money from Plaintiff. The fallacy of Defendants' argument, however, is that Plaintiff alleges that Equity Title and Winkel fraudulently attempted, and did in fact, obtain money belonging to Plaintiff. The Court finds that the complaint sufficiently pleads a claim for conspiracy as to these Defendants. Accordingly, Defendants' motion to dismiss Plaintiff's state law conspiracy claim is denied.

## IV. CONCLUSION

For the reasons stated herein, the Court grants Defendants Equity Title and Steven Winkel's motion to dismiss Plaintiff's claims for violation of 42 U.S.C. § 3605; 15 U.S.C. § 1691, *et seq.;* 15 U.S.C. § 1601, *et seq.;* and 12 U.S.C. § 2604(c), without legal prejudice. The Court also grants Defendants' motion to dismiss Plaintiff's claims for breach of contract and for "unconscionability," without legal prejudice. The Court, however, denies Defendant's motion to dismiss Plaintiff's claims for violation of 42 U.S.C. § 3604(b); 18 U.S.C. § 1962(c) and (d); 12 U.S.C. § 2607(b); and Tenn.Code Ann. § 47–18–109(a). Likewise, the Court denies Defendants' motion to dismiss Plaintiff's claims for fraud, breach of fiduciary duty, conspiracy, and negligent misrepresentation. Furthermore, the Court grants Plaintiff fifteen days from the issuance of this order to amend the complaint with respect to her claim for violation of 12 U.S.C. § 2607(b).

**IT IS SO ORDERED** this ⸺ day of February, 2005.